**IN THE U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

| | | |
|---|---|---|
| Clinton Solar LLC | : | Case No. 1:23-cv-00206 |
| c/o Jonathan R. Secrest | : | |
| Dickinson Wright PLLC | : | |
| 180 East Broad Street, Suite 3400 | : | Judge _____ |
| Columbus, OH 43215 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -vs- | : | |
| | : | |
| Robert E. Stoll, II | : | |
| 1909 E Sr 22-3 | : | |
| Morrow, OH 45152 | : | |
| | : | |
| -and- | : | |
| | : | |
| RES Farms LLC | : | |
| c/o Robert E. Stoll II (Reg. Agent) | : | |
| 1909 E. US 22-3, Unit 3 | : | |
| Morrow, OH 45152 | : | |
| | : | |
| Defendants. | : | |

**VERIFIED COMPLAINT FOR
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION,
PERMANENT INJUNCTION, AND OTHER RELIEF**

Plaintiff Clinton Solar LLC ("Plaintiff"), through counsel, respectfully submits for its

Verified Complaint against Defendants Robert E. Stoll, II ("Stoll") and RES Farms LLC ("RES

Farms") (together, "Defendants"), the following:

**PARTIES, JURISDICTION, AND VENUE**

1.     Plaintiff is building a solar-powered electric generation facility in Clinton County,

Ohio in order to provide clean, sustainable energy to the region, and Defendants' unlawful

conduct described herein and in Plaintiff's contemporaneous Motion for Temporary Restraining

Order and Preliminary Injunction is preventing timely and complete construction of the project, such that Defendants' conduct must be urgently addressed and remedied pursuant to this lawsuit.

2. Plaintiff is a Delaware limited liability company. Plaintiff's sole member is Core Fund 1, LLC, a Delaware limited liability company. Core Fund 1, LLC's sole member is Core Solar, LLC, a Delaware limited liability company. Core Solar, LLC's sole member is TotalEnergies Renewables USA, LLC ("TERUSA"), a Delaware limited liability company.

3. TERUSA's sole member is TotalEnergies Delaware, Inc., which was formed in Delaware and does not have members who reside or principal places of business in Ohio.

4. Stoll is an individual who resides and/or owns real estate in Clinton County, Ohio.

5. RES Farms is an Ohio limited liability company that owns real estate in Clinton County, Ohio.

6. Accordingly, there is complete diversity of citizenship.

7. Stoll owns and controls RES Farms and is its statutory agent with the Ohio Secretary of State. *See Articles of Organization attached as Exhibit A.*

8. To Plaintiff's knowledge, Stoll has complete control over RES Farms such that RES Farms has no separate mind, will, or existence of its own.

9. The real estate at issue in this action is located in Clinton County, Ohio, which is within this Judicial District.

10. Effective on July 15, 2020, Stoll and Plaintiff entered into a Purchase Option and Purchase and Sale Agreement ("Agreement") concerning property in Clinton County, Ohio. *Agreement along with recorded Memorandum of Purchase Option and Purchase and Sale Agreement attached as Exhibit B.* Stoll previously owned the property in his own name, but

2

impermissibly transferred it into the name of his company, RES Farms. *See Agreement*, §§ 8.1(a), 7.3.

11.     The matter in controversy exceeds the value of $75,000, exclusive of interest and costs, because, if specific performance is not ordered (which it should be), the damages sustained as a result of Defendants' refusal to comply with the Agreement exceed $32,000,000 as set forth herein.

12.     In accordance with the foregoing and the facts and claims stated herein, venue is proper in this Court and this Court has jurisdiction over this dispute.

## FACTUAL ALLEGATIONS

13.     Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

14.     Pursuant to the Agreement, Stoll granted to Plaintiff the irrevocable, sole, and exclusive right and option to purchase ("Option") the property described in the Agreement ("Property"). *Agreement*, § 1.1(a).

15.     The rights and obligations in the Agreement are unambiguous, and Stoll executed the Agreement and expressly affirmed therein, *inter alia*:

> [He was] afforded sufficient time to review and to understand the terms and effects of th[e] Agreement and to submit it to legal counsel of [his] choosing for review and advice. [He] represents that the agreement and obligations in [the Agreement] are made voluntarily, knowingly and without duress.

*Id*. at § 16.12.

16.     Plaintiff paid $10,000 to Stoll at the time the Agreement was executed and $1,549.77 in each of the years 2020, 2021, and 2022 as consideration. *See id*. at § 3.1(a)-(c). Those payments are credits deducted from the purchase price of the Property at closing of Plaintiff's exercise of the Option. *Id.* at § 3.2(b).

17.     Stoll expressly agreed not to sell, convey, or otherwise transfer any part of the Property or any of his rights, title, or interests in the Property, and he further agreed that violating those restrictions is a breach of the Agreement that he must immediately cure. *Id*. at § 7.3.

18.     Despite his contractual obligations, on April 21, 2021, Stoll transferred the Property to RES Farms via General Warranty Deed, which was recorded in the official records of Clinton County, Ohio on April 29, 2021 as instrument number 2021-00002527. *Deed attached as Exhibit C* ("Deed").

19.     Additionally, pursuant to the Agreement, Stoll agreed, if ownership of the Property is vested in his affiliate — in this case, RES Farms — he shall cause his affiliate to become a party to the Agreement or to enter into a new agreement in the same form and substance with respect to the Property. *Agreement*, § 6.3(b). Stoll failed to do so with regard to RES Farms.

20.     That prompted Plaintiff to send a Real Property Rights Assignment and Assumption Agreement to Stoll in order to cause RES Farms to become a party to the Agreement or enter into another agreement in the same form and substance with respect to the Property, but Defendants refused to sign it. *Assignment and Assumption Agreement attached as Exhibit D*.

21.     The foregoing is evidence of Defendants' repudiation of their obligations under the Agreement.

22.     Regardless, the Deed and transfer from Stoll to RES Farms is expressly subject to "all easements, covenants and restrictions of record." *Deed*; *see Exhibit B* (Memorandum of Purchase Option and Purchase and Sale Agreement recorded November 12, 2020).

23.     Furthermore, the Agreement runs with the Property and is binding upon all parties claiming interest in the Property, including Stoll's successors and assigns, specifically RES Farms. *Agreement*, §§ 16.8, 16.9.

24.     On July 15, 2022, Plaintiff's agent spoke with Stoll, and Stoll used abusive language and would not confirm his intent to fulfill the contractual obligation to sell the Property to Plaintiff. That was another indication of Defendants' repudiation of the Agreement.

25.     The Property is critical and indispensable to Plaintiff timely building a solar-powered electric generation facility in Clinton County, Ohio.

26.     The timeliness of the closing of the Option transaction with Defendants, in particular, is critical because Plaintiff must conduct a survey for an endangered bat species on the Property and that survey can only be done between June 1 and August 15 because of the seasonal activity of the bats. It takes time in advance of June 1 to set up the equipment to conduct the bat survey. Thus, Plaintiff must have access to conduct the bat survey on the Property by May 1, 2023, which is less than a month from now. In addition to the bat surveying between June 1 to Aug 15, Plaintiff will begin full construction activities at the end of August 2023.

27.     Plaintiff already has millions of dollars invested in construction of the project.

28.     If Defendants do not timely close on the Option transaction and the Property is not included in the project, Plaintiff will suffer losses over the life of the project of approximately $32,000,000 in revenue alone.

29.     Accordingly, in order to move forward, on September 23, 2022, Plaintiff timely provided Defendants with written notice of its exercise of the Option to purchase the Property with a closing by March 31, 2023. *Letter attached as Exhibit E*; *Agreement*, §§ 2.1, 2.2(a).

30.     On March 2, 2023, Plaintiff overnighted a letter and closing documents to Stoll and RES Farms for them to fill-out, execute, and return no later than March 31, 2023 in order to close the Option transaction to purchase the Property. Plaintiff provided Defendants with a pre-addressed FedEx envelope for their delivery of the closing documents to the appointed title company, and Plaintiff confirmed for Defendants its readiness to complete all of its obligations under the Agreement. *Letter attached as Exhibit F*.

31.     Due to information indicating Defendants are repudiating the Agreement, Plaintiff stated in the March 2, 2023 letter:

> It is our understanding that you have had conversations in the community that you will not cooperate in the sale of the Property. This amounts to an anticipatory repudiation of the Agreement by you.
>
> Under the terms of the Agreement, you have agreed to convey the Property to [Plaintiff]. Pursuant to Section 7.4, you have agreed not to interfere or hinder the exercise of [Plaintiff's] rights under the Agreement. It is [Plaintiff's] expectation that you will cooperate and fulfill all of your contractual obligations under the Agreement. Should you not fulfill your obligations under the Agreement; [Plaintiff] will be forced to pursue all available remedies at law and/or in equity.
>
> If you do not intend to cooperate and fulfill all your obligations under the Agreement, please notify [Plaintiff's counsel] no later than ten (10) days from the date of this letter [*i.e.*, by March 12, 2023].

*Id*. at p. 2.

32.     The March 2, 2023 letter was delivered to Defendants the next day on March 3, 2023 via residential delivery, and Defendants did not respond in any fashion. *FedEx delivery confirmation attached as Exhibit G*.

33.     On March 13, 2023, Plaintiff followed-up with an email to Stoll regarding the closing documents, inviting Stoll to respond with any questions, and confirming Plaintiff's desire for the parties to fulfill their contractual obligations. *Emails attached as Exhibit H*.

34. On March 14, 2023, Plaintiff again emailed Stoll confirming delivery of the closing documents to Defendants and that Plaintiff attempted to contact Defendants at the email address Stoll provided and called him at the phone number he provided. Plaintiff again indicated its desire to facilitate closing consistent with the terms of the Agreement. Plaintiff asked Defendants to respond, but they have not responded in any fashion. *Id*.

35. On March 27, 2023, Plaintiff emailed Defendants the closing documents executed by Plaintiff for the closing set for March 31, 2023. Those documents reflect, *inter alia*, the scheduled disbursement to Defendants upon closing of the contract price for the purchase of the Property: $558,707.54. *Closing Documents attached as Exhibit I*; *Agreement*, § 5.1.

36. In that correspondence, Plaintiff also noted the lack of any response from Defendants, its expectation that the terms of the Agreement will be honored, and that Plaintiff will be forced to pursue all available remedies if Defendants do not fulfill their obligations. *Exhibit H*.

37. March 31, 2023 has passed, Defendants have not closed on the transaction in accordance with the Agreement, and Defendants have not otherwise contacted or responded to Plaintiff in any fashion.

38. Accordingly, it is definitively clear that Defendants repudiated the Agreement and this action is necessary to enforce the Agreement.

39. Plaintiff, on the other hand, has fulfilled its obligations under the Agreement and stands ready to close the Option transaction.

40. Defendants have breached the Agreement as described herein, including but not limited to the provisions requiring cooperation with Plaintiff purchasing the Property, such as:

> Seller shall not engage in any activity with respect to the Property that could or does interfere with, interrupt, harm, diminish, hinder, disrupt, disturb, damage

and/or otherwise negatively affect or impact… [Plaintiff's] exercise of any of its rights and interests contained in this Agreement.

*Agreement*, § 7.4.

41. Because Defendants breached, *inter alia*, Section 7.4 of the Agreement, they have no right to a cure period before Plaintiff takes immediate action for breach without prior notice to them. *Id*. at § 14.1.

42. Although no notice or cure period is required pursuant to the Agreement, Plaintiff has contacted Defendants several times asking for cooperation with Plaintiff exercising its Option. *See Exhibits*; *supra*.

43. Pursuant to the Agreement, Defendants expressly agreed that Plaintiff is irreparably harmed by breach of Section 7.4, in particular; an award of damages is inadequate to remedy such a breach; and Plaintiff is entitled to equitable relief, including, without limitation, specific performance and/or injunctive relief, to compel Defendants' compliance with the Agreement. *Agreement*, § 14.1.

44. Accordingly, in conjunction with this Verified Complaint, Plaintiff is filing a Motion for Temporary Restraining Order and Preliminary Injunction to compel Defendants' compliance with the Agreement.

45. All conditions precedent to bringing this action are satisfied.

## COUNT I - BREACH OF CONTRACT

46. Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

47. The Agreement is a valid contract between Stoll and Plaintiff by virtue of Stoll's informed and voluntary execution of the Agreement, and it is binding upon RES Farms pursuant to, *inter alia*, Sections 16.8 and 16.9 of the Agreement and because RES Farms is an entity that

Stoll owns and controls and, to Plaintiff's knowledge, RES Farms has no separate mind, will, or existence of its own. *Supra*; *Agreement*, §§ 16.12, 16.8, 16.9.

48.     Plaintiff performed its obligations under the Agreement by, *inter alia*, paying Stoll consideration, executing closing documents and providing them to Defendants, and funding the disbursement to Defendants upon closing of the contract price for the purchase of the Property: $558,707.54.

49.     Defendants repudiated and breached the Agreement as described herein and reflected by the evidence attached as Exhibits.

50.     If Defendants do not timely close on the Option transaction, as expressly set forth in the Agreement, herein, and in Plaintiff's contemporaneous Motion, Plaintiff will be irreparably harmed, an award of damage is inadequate to remedy the harm, and Plaintiff is entitled to equitable relief, including specific performance and/or injunctive relief, to compel Defendants' compliance with the Agreement.

51.     Defendants must fulfill their contractual obligations and their unlawful repudiation and breach of the Agreement cannot be permitted to prevent or impair the construction of a solar-powered electric generation facility in Clinton County, Ohio, which will provide clean and sustainable energy in the region.

52.     An award of money damages is inadequate to protect or compensate Plaintiff pursuant to the express terms of the Agreement and as a matter of law.

53.     On the contrary, if Defendants close on the Option transaction, they will receive the full benefit of the bargain and not be damaged.

54.     Accordingly, specific performance by Defendants is the appropriate remedy.

## COUNT II – DECLARATORY JUDGMENT

55.     Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

56.     Plaintiff is entitled to exercise its irrevocable, sole, exclusive, and unambiguous right and Option to purchase the Property pursuant to the Agreement.

57.     R.C. 2721.01, *et seq*., provides for this Court to determine and declare, *inter alia*, Plaintiff's rights pursuant to the Agreement.

58.     There is a real and present controversy regarding rights and obligations under the Agreement as discussed herein and established by the Exhibits.

59.     The controversy and this action are justiciable in character and within the scope of the Declaratory Judgment Act.

60.     Defendants repudiated and breached the Agreement with regard to the Option transaction.

61.     Declaratory judgment and specific performance will terminate the controversy.

62.     Speedy relief is necessary to preserve and address Plaintiff's rights that may otherwise be lost or impaired as set forth herein.

63.     Plaintiff seeks and is entitled to declaratory judgment ordering, *inter alia*: (i) Plaintiff has the right to acquire the Property from Defendants; (ii) Defendants repudiated and breached the Agreement by not timely closing on the Option transaction; (iii) specific performance by Defendants is the appropriate remedy; and (iv) Defendants must close on the Option transaction without delay.

**WHEREFORE**, Plaintiff respectfully requests that this Court issue immediate, preliminary, and permanent injunctive relief for specific performance against Defendants, enter declaratory judgment against Defendants, and award damages against Defendants, jointly and

severally, if necessary, including pre- and post-judgment interest, reasonable attorneys' fees, costs, and other expenses as authorized by the Agreement and law, as well as any other relief at law or in equity deemed appropriate by this Court.

Respectfully submitted,

*/s/ Jonathan R. Secrest*
Jonathan R. Secrest (0075445) (Trial Counsel)
David A. Lockshaw, Jr. (0082403)
Manuel D. Cardona (0098079)
DICKINSON WRIGHT PLLC
180 East Broad Street, Suite 3400
Columbus, Ohio 43215
Telephone (614) 744-2945
Facsimile (844) 670-6009
jsecrest@dickinsonwright.com
dlockshaw@dickinsonwright.com
mcardona@dickinsonwright.com
*Counsel for Plaintiff*

11



| DATE | DOCUMENT ID | DESCRIPTION | FILING | EXPED | CERT | COPY |
|------|-------------|-------------|--------|-------|------|------|
| 04/25/2021 | 202110601152 | DOMESTIC FOR PROFIT LLC - ARTICLES OF ORG (LCP) | 99.00 | 0.00 | 0.00 | 0.00 |

**Receipt**

This is not a bill. Please do not remit payment.

COOPER, ADEL & ASSOCIATES
30 OVERBROOK DRIVE SUITE D
MONROE, OH 45050

# STATE OF OHIO
## CERTIFICATE

### Ohio Secretary of State, Frank LaRose

**4661098**

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**RES FARMS LLC**

and, that said business records show the filing and recording of:

Document(s)                                                                      Document No(s):

**DOMESTIC FOR PROFIT LLC - ARTICLES OF ORG**                          **202110601152**
                     Effective Date:   04/16/2021



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of the Secretary of State at Columbus, Ohio this 25th day of April, A.D. 2021.

**Ohio Secretary of State**

Form 533A Prescribed by:



**Frank LaRose**
*Ohio Secretary of State*

Date Electronically Filed: 4/16/2021

Toll Free: 877.767.3453 | Central Ohio: 614.466.3910

OhioSoS.gov | business@OhioSoS.gov

File online or for more information: OhioBusinessCentral.gov

# Articles of Organization for a Domestic Limited Liability Company

### Filing Fee: $99
### Form Must Be Typed

## CHECK ONLY ONE (1) BOX

| (1) Articles of Organization for Domestic For-Profit Limited Liability Company (115-LCA) ◉ | (2) Articles of Organization for Domestic Nonprofit Limited Liability Company (115-LCA) ☐ |
|---|---|

Name of Limited Liability Company: RES Farms LLC

(Name must include one of the following words or abbreviations:
"limited liability company", "limited", "LLC", "L.L.C.", "ltd.", or "ltd".)

**Optional:** Effective Date (MM/DD/YYYY) 4/16/2021

(The legal existence of the limited liability company begins upon the filing of the articles or on a later date specified that is not more than ninety days after filing.)

**Optional:** This limited liability company shall exist for _____

Period of Existence

**Optional:** Purpose

** **Note for Nonprofit LLCs**
The Secretary of State does not grant tax exempt status. Filing with our office is not sufficient to obtain state or federal tax exemptions. Contact the Ohio Department of Taxation and the Internal Revenue Service to ensure that the nonprofit limited liability company secures the proper state and federal tax exemptions. These agencies may require that a purpose clause be provided. **

## Original Appointment of Statutory Agent

The undersigned authorized member(s), manager(s) or representative(s) of

| RES Farms LLC |
|---|

(Name of Limited Liability Company)

hereby appoint the following to be Statutory Agent upon whom any process, notice or demand required or permitted by statute to be served upon the corporation may be served. The complete address of the agent is:

| ROBERT E. STOLL II |
|---|

(Name of Statutory Agent)

| 1909 E. US 22-3, UNIT 3 |
|---|

(Mailing Address)

| MORROW | OH | 45152 |
|---|---|---|

(Mailing City)        (Mailing State)   (Mailing ZIP Code)

## Acceptance of Appointment

The Undersigned,   | ROBERT E. STOLL II |   , named herein as the

(Name of Statutory Agent)

Statutory agent for   | RES Farms LLC |

(Name of Limited Liability Company)

hereby acknowledges and accepts the appointment of statutory agent for said limited liability company.

Statutory Agent Signature   | ROBERT E. STOLL II |

(Individual Agent's Signature / Signature on Behalf of Business Serving as Agent)

**By signing and submitting this form to the Ohio Secretary of State, the undersigned hereby certifies that he or she has the requisite authority to execute this document.**

**Required**

Articles and original appointment of agent must be signed by a member, manager or other representative.

If the authorized representative is an individual, then they must sign in the "signature" box and print his/her name in the "Print Name" box.

If the authorized representative is a business entity, not an individual, then please print the entity name in the "signature" box, an authorized representative of the business entity must sign in the "By" box and print his/her name and title/authority in the "Print Name" box.

| ROBERT E. STOLL II |
| --- |

Signature

| |
| --- |

By (if applicable)

| |
| --- |

Print Name

| |
| --- |

Signature

| |
| --- |

By (if applicable)

| |
| --- |

Print Name

| |
| --- |

Signature

| |
| --- |

By (if applicable)

| |
| --- |

Print Name

**RECORDING REQUESTED BY AND**
**WHEN RECORDED, MAIL TO:**

Clinton Solar LLC
1201 Louisiana Street, Suite 3200
Houston, Texas 77002
Attention: Land Department

**PREPARED BY:**

Terrence N. O'Donnell
Dickinson Wright PLLC
150 E. Gay Street, Suite 2400
Columbus, Ohio 43215
Phone: (614) 744-2583

**2020-00005879**

KIND: AGREEMENT
RECORDED: 11/12/2020 03:18:34 PM
FEE AMT: 70.00
CLINTON COUNTY, OHIO
BRENDA J. HUFF RECORDER

*Electronically Recorded*

---

## MEMORANDUM OF PURCHASE OPTION AND
## PURCHASE AND SALE AGREEMENT

This **MEMORANDUM OF PURCHASE OPTION AND PURCHASE AND SALE AGREEMENT** (this "***Memorandum***") is made as of ‾‾July 2‾‾, 2020 by and between **Robert E. Stoll, II, a single man** ("***Seller***"), whose mailing address is 1909 E Sr 22-3, Morrow, OH 45152, and **CLINTON SOLAR LLC**, a Delaware limited liability company ("***Purchaser***"), whose mailing address is 1088 Sansome Street, San Francisco, California 94111, to serve as notice to all parties and persons that Seller and Purchaser have entered into a Purchase Option and Purchase and Sale Agreement (the "***Agreement***"), with an effective date of ‾‾July 15‾‾, 2020 (the "***Effective Date***"). Seller and Purchaser (and their respective successors and assigns under the Agreement) are sometimes hereinafter referred to collectively as the "***Parties***".

Seller claims title to that certain real property situated in Clinton County, Ohio, and legally described on **Exhibit A** attached hereto and made a part hereof (the "***Land***"), pursuant to that certain instrument dated November 19, 1998, and recorded on December 2, 1998, in Volume 285, Page 85, in the Clinton County, Ohio, real property records (the "***Real Property Records***").

For and in consideration of the mutual covenants and promises contained in the Agreement and other good and valuable consideration, the Parties hereby agree that under and pursuant to the Agreement:

1.      Seller granted to Purchaser the irrevocable, sole and exclusive right and option to purchase (the "***Option***") all or any portions of the Land, together with any and all of Seller's rights, title and interests in and to (i) buildings, structures, fixtures and other improvements located on the Land as of any Closing (as defined below) and (ii) other appurtenances and interests pertaining to or benefiting the Land, including, without limitation, any and all development rights, entitlements, water rights, mineral rights, claims, strips and gores, easements, leases, licenses, permits and other rights in and to adjoining roadways and rights-of-way (the Land and such other property are referred to herein collectively as the "***Property***"). Seller granted to Purchaser the sole and exclusive right, during the Option Term (as defined below) to evaluate, examine, inspect, investigate, assess, research, test, study, record, measure and monitor the Property and all resources, of whatever kind and nature, located on, about, above, over, through, across, within and at the Land and as additionally provided in the Agreement. In connection with such activities and Purchaser's other rights under the Agreement, Seller granted to Purchaser a non-exclusive, right-of-entry license upon, over,

through and across the Land. Such license shall automatically terminate upon the expiration or termination of the Option and the Agreement.

2.      If the Land is located within a portion of real property owned by Seller and there is no reasonable access to and from the Land and a public right-of-way, Seller granted to Purchaser a non-exclusive, temporary access easement for the purposes of ingress, egress and regress to and from the Land and a public right-of-way, which easement shall be on, over, through, across and within Seller's real property located adjacent to the Land, in a location mutually and reasonably determined by Seller and Purchaser. The temporary access easement shall automatically terminate upon the expiration or termination of the Option and the Agreement; provided, however, upon any Closing, the Parties shall enter into an access easement agreement, mutually acceptable to both Parties, under which Seller shall grant to Purchaser a permanent, exclusive access easement to and from the Land and a public right-of-way.

3.      The Option shall have a term of up to three (3) years from the Effective Date (the "***Option Term***"), and the Agreement may be further extended by a closing period of at least one hundred eighty (180) days following Purchaser's exercise (if any) of the Option.

4.      From the Effective Date through any closing of the sale and purchase of the Property to Purchaser (the "***Closing***"), the right to purchase and/or acquire the Property and any and all rights, title and interests of Seller in and to the Property shall be exclusive to Purchaser, and Seller shall not sell, convey, dispose of, exchange, contribute, gift or otherwise transfer, or in any way further or newly encumber (whether by lien, lease, easement, license or otherwise, including any renewals or extensions thereof), all or any part of (i) the Property, (ii) Seller's oil, gas or other mineral interests therein (if any) or (iii) any of Seller's other rights, title or interests in and to same.

5.      If Closing does not occur, then the Option, the Agreement and this Memorandum shall automatically terminate, and the Property shall be deemed released therefrom. If Closing occurs, the Option, the Agreement and this Memorandum shall automatically terminate as of the date of the warranty deed from Seller to Purchaser conveying the Property, and the Property shall be deemed released from the Option, the Agreement and this Memorandum as of such date of conveyance.

6.      The Option, the Agreement and this Memorandum shall constitute real rights and covenants touching, concerning and running with and burdening the Property and shall be binding upon all persons and parties claiming any interest in the Property or any portion thereof, including, without limitation, each Party's successors and assigns and, if applicable, any such Party's heirs, executors, administrators and personal representatives.

7.      This Memorandum is intended to provide notice to third parties of the Agreement and certain provisions contained therein. Nothing in this Memorandum amends, modifies or otherwise affects or controls over (nor shall anything herein be interpreted or deemed to amend, modify or otherwise affect or control over) the terms, conditions, restrictions and/or provisions contained in the Agreement, and in the event of any conflicts between the contents of said instruments, the contents of the Agreement shall control over the contents of this Memorandum.

8.      The Agreement and this Memorandum shall be governed by the laws of the State in which the Land is situated, without regard to any conflicts of law principles to the contrary.

9.      This Memorandum may be executed in separate and multiple counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

*[Signature pages and Exhibit follow this page]*

IN WITNESS WHEREOF, the Parties hereto have caused this Memorandum to be duly executed by their respective authorized representatives.

**SELLER:**

Signature: _Rbrt E. Stll II_

Printed Name: Robert E. Stoll, II

### State of Ohio Statutory Short Form of Acknowledgment

STATE OF _Ohio_
COUNTY OF _Clinton_

The foregoing instrument was acknowledged before me this _2nd_ day of _July_ , 20_20_ by Robert E. Stoll, II, a single man.

(NOTARY SEAL)

**BRENT M RIGGLE**
Notary Public, State of Ohio
My Commission Expires
March 12, 20_22_

Signature: _Brent M Riggle_
Printed Name: _Brent M. Riggle_
Notary Public in and for the State of _Ohio_
My Commission Expires: _3-12-2022_

**PURCHASER:**

**CLINTON SOLAR LLC**

By: _____
Name: _Blake Rasmussen_
Title: _Authorized Signatory_

STATE OF TEXAS

COUNTY OF HARRIS

The foregoing instrument was acknowledged before me this _15_ day of _July_ , 20_20_ by _Blake Rasmussen_ , as _Authorized Signatory_ of **CLINTON SOLAR LLC**, a Delaware limited liability company, on behalf of the limited liability company.

(NOTARY SEAL)

Signature: _Emily McClary Davis_
Printed Name: _Emily McClary Davis_
Notary Public in and for the State of Texas
My Commission Expires: _3-15-2021_

EMILY MCCLARY DAVIS
Notary Public, State of Texas
Comm. Expires 03-15-2021
Notary ID 131046982

**Exhibit A to the Memorandum of Purchase Option and
Purchase and Sale Agreement**

**Description of the Land**

Approximately **44.279** acres of land, more or less, situated in the Township of Clark, County of
Clinton and State of Ohio, being Clinton County Tax Map Parcel Number 070030702000000
and being more particularly described by that certain deed dated November 19, 1998 from Paul
Allen Kelly and Joyce A. Kelly to Robert E. Stoll, II, recorded at Instrument Number 1998-
00009703 on December 2, 1998 in the Office of the Recorder of Deeds of the aforementioned
County and State and being more fully described as follows:

Situate in Clark Township, Clinton County, Ohio and being a part of Military Survey No. 1939
and bounded and described as follows:

Beginning at a nail (found) in the center of State Route 350 at the Northeasterly corner of a 9.678
Acre Tract as recorded in Volume 28, Plat No. 127, of the Clinton County Engineers Record of
Land Division: Running thence, from said point of beginning, with the lines of a 136.50 Acre
Tract as recorded in Volume 9, Page 423, of the Clinton County Surveyors Record in State Route
350, on the following courses: (1) N 74°20'43" E 402.81 feet to a nail (found); (2) N 81°46'00"
E 345.30 feet to a nail (set); thence, by a new division line, S 3°15'26" E (passing a 5/8" iron pin
(set) at 30.00 feet) a distance of 2147.01 feet to a 5/8" iron pin (set); thence, with the lines of the
aforesaid 136.50 Acre Tract, on the following courses: (1) N 87°47'09" W 1186.54 feet to a 5/8"
iron pin (set); (2) N 2°51'42" W (passing a 5/8" iron pin (set) at 308.82 feet) a distance of 353.82
feet to a point; thence with the lines of the aforesaid 9.678 Acre Tract in a stream, on the
following courses: (1) N 33°21'36" E 524.32 feet to a point (witness a 5/8" iron pin (set) bears
N 88°50'00" E 35.00 feet); (2) N 2°38'11" W 796.10 feet to a point (witness a 5/8" iron pin (set)
bears N 78°47'00" E 28.00 feet); (3) N 15°49'06" E 366.89 feet to the point of beginning,
containing Forty Four and Two Hundred Seventy Nine Thousandths (44.279) Acres. Subject to
all legal highways and easements of record.

This description is the result of a new survey made under the direction of Richard D. Roll,
Registered Surveyor No. 4957, by CLINCO AND SUTTON SURVEYORS, Wilmington, Ohio,
in October 1998, as recorded in Volume 29, Plat No. 197, of the Clinton County Engineers
Record of Land Division. The bearings in this description were derived from the survey of the
aforesaid 136.50 Acre Tract (N 81°46'00" E on the center of State Route 350).

Subject to all real property taxes and assessments now a lien upon said premises, the payment of
which shall be prorated by the parties as of the date hereof.

Prior Instrument Reference: Volume 19, at Page 110, Official Records, Clinton County, Ohio.

## PURCHASE OPTION AND PURCHASE AND SALE AGREEMENT

THIS **PURCHASE OPTION AND PURCHASE AND SALE AGREEMENT** (this "***Agreement***") is made and entered into to be effective as of _July 15_ , 2020 (the "***Effective Date***"), by and between **Robert E. Stoll, II, a single man**, ("***Seller***") whose mailing address is **1909 E Sr 22-3, Morrow, OH 45152**, and **CLINTON SOLAR LLC**, a Delaware limited liability company ("***Purchaser***"), whose mailing address is 1088 Sansome Street, San Francisco, California 94111, Attention: General Counsel. Seller and Purchaser are sometimes hereinafter referred to individually as a "***Party***" and collectively as the "***Parties***".

### RECITALS

WHEREAS, Seller is the fee simple owner of that certain real property situated in Clinton County, Ohio, being more particularly described in **Exhibit A** attached hereto and incorporated herein for all purposes (the "***Land***"); and

WHEREAS, Seller wishes to grant to Purchaser the irrevocable, sole and exclusive right and option to purchase all or any portion(s) of the Land, together with all rights, interests, benefits and appurtenances thereto, and Purchaser desires to have the exclusive, irrevocable right and option to purchase same from Seller.

### AGREEMENTS

NOW THEREFORE, in consideration of Ten Thousand and 00/100 Dollars ($10,000.00) and the promises and covenants made herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby mutually agree as follows:

### ARTICLE I
### OPTION TO PURCHASE

**Section 1.1    Grant of Option to Purchase.**



(a)    Seller hereby grants to Purchaser the irrevocable, sole and exclusive right and option to purchase (the "***Option***") all ~~or any portion(s)~~ of the Land, together with any and all of Seller's rights, title and interests in and to (i) buildings, structures, fixtures and other improvements located on the Land as of the Closing (as defined in Section 5.2 below), and (ii) other appurtenances and interests pertaining to or benefiting the Land, including, without limitation, any and all development rights, entitlements, water rights, mineral rights, claims, strips and gores, easements, leases, licenses, permits and other rights in and to adjoining roadways and rights-of-way (the Land and such other property are referred to herein collectively as the "***Property***").

(b)    In exercising the Option (if at all), Purchaser may elect to purchase less than all of the Land by delivering the legal description of such portion(s) of the Land with the Option Exercise Notice (as defined in Section 2.2(a) below), in which event the Parties shall enter into a written amendment to this Agreement to replace **Exhibit A** attached hereto. In addition, the term **"Land"** as used in this Agreement shall thereafter mean the land described in such replacement **Exhibit A**, and the term **"Property"** as used in this Agreement shall thereafter mean such land together with the appurtenances and interests described in Section 1.1(a) above that pertain to or benefit such land.

**Section 1.2    Grant of Right-of-Entry License to the Land.** During the Option Term (as defined in Section 2.1 below), Purchaser shall have the sole and exclusive right to evaluate, examine, inspect,

investigate, assess, research, test, study, record, measure and monitor the Property and all resources, of whatever kind and nature, located on, about, above, over, through, across, within and at the Land and as additionally provided in Section 6.4 below. In connection with such activities and Purchaser's other rights under this Agreement, Seller hereby grants to Purchaser a non-exclusive, right-of-entry license upon, over, through and across the Land in connection with Purchaser's exercise of its rights under this Agreement. Such license shall automatically terminate upon the expiration or termination of the Option and this Agreement.

**Section 1.3**     <u>**Grant of Access Easement to a Public Right-of-Way**</u>. If the Land is located within a portion of real property owned by Seller, and there is no reasonable access to and from the Land and a public right-of-way, Seller hereby grants Purchaser a non-exclusive, temporary access easement for the purposes of ingress, egress and regress to and from the Land and a public right-of-way, which easement shall be on, over, through, across and within Seller's real property located adjacent to the Land, in a location mutually and reasonably determined by Seller and Purchaser. The temporary access easement shall automatically terminate upon the expiration or termination of the Option and this Agreement; provided, however, upon any Closing, the Parties shall enter into an access easement agreement, mutually acceptable to both Parties, under which Seller shall grant to Purchaser a permanent, exclusive access easement to and from the Land and a public right-of-way.

**Section 1.4**     <u>**Record Notice of Option to Purchase**</u>. In accordance with the confidentiality provisions of Section 7.1 below, in no event shall either Party record or otherwise make public this Agreement or the terms hereof. However, contemporaneously with each Party's execution of this Agreement, such Party will execute and have notarized an instrument in the form attached hereto as **Exhibit B** (the "***Memorandum***"). Purchaser, at its expense, shall record the Memorandum in the real property records of each county in which the Land is located (the "***Real Property Records***") in order to give notice to third parties of the Option and this Agreement.

## ARTICLE II
## OPTION TERM; OPTION EXERCISE

**Section 2.1**     <u>**Option Term**</u>. The Option shall a term of three (3) years from the Effective Date (the "***Option Term***").

**Section 2.2**     <u>**Exercise of Option**</u>.

(a)     If and when Purchaser elects to exercise the Option, which may occur at any time during the Option Term, Purchaser shall do so by providing Seller with written notice of such election (the "***Option Exercise Notice***").

(b)     The deadline for providing the Option Exercise Notice shall be 5:00 p.m. Pacific Time on the Expiration Date of the Option Term, and electronic delivery of the foregoing notice(s) shall be sufficient. If Purchaser validly and timely exercises the Option, this Agreement shall continue in full force and effect until any Closing.

(c)     If Purchaser should fail to timely exercise the Option, and provided that at such time there is no uncured Seller Default (as defined in Section 14.1(a) below) under this Agreement, then Seller shall retain any and all prior Option Payments in full satisfaction and accord of Purchaser's obligations under this Agreement, and neither Party shall have any further liability to the other under this Agreement, except as expressly provided otherwise elsewhere in this Agreement.

## ARTICLE III

**OPTION PAYMENTS**

Section 3.1    **Option Term Payments.**

(a)    Purchaser shall pay Seller Ten Thousand and 00/100 Dollars ($10,000.00) as of the date this Agreement is executed;

(b)    As consideration for the Option Term and all other rights and interests of Purchaser contained in this Agreement, Purchaser shall make an annual payment to Seller in an amount equal to **one thousand five hundred forty-nine dollars and 77/100 ($1,549.77)** each year of the Option Term that occurs. The Option Term Payments are referred to in this Agreement individually as an "***Option Payment***" and collectively as the "***Option Payments***".

(c)    Purchaser shall pay the Option Payment for the first year of the Option Term within twenty (20) business days of the later of (i) the Effective Date or (ii) Purchaser's receipt of Seller's fully completed "Vendor Packet" materials (including Form W-9), which materials were provided to Seller prior to the Effective Date. The Option Payment for each successive year of the Option Term that occurs shall be paid within twenty (20) business days of such year's commencement date (*i.e.*, the anniversary date of the Effective Date for each successive year that occurs).

(d)    For the avoidance of doubt, if Purchaser exercises the Option in any year prior to the last year of the Option Term, then no further Option Payments shall be due or made for any subsequent years that would have occurred but for such exercise of the Option.

Section 3.2    **Application of Option Payments.**

(a)    At the time of any termination or expiration of the Option and this Agreement, the Option Payments previously made by Purchaser shall be non-refundable unless Purchaser terminates this Agreement (i) prior to the Expiration Date for reason(s) of a Seller Default that has not been cured by the end of its permitted Seller Cure Period (as defined in Section 14.1(a) below), a Condemnation (as defined in Section 13.1(a) below) or a Casualty (as defined in Section 13.2(a) below) or (ii) on the date designated for Closing if any of Purchaser's conditions precedent to Closing set forth in Section 9.1 below has not been met. If Purchaser so terminates during the Option Term for any of the reasons listed in clause (i) above, then the Option Payment made by Purchaser for the Option year in which such termination date occurs shall be prorated and refunded to Purchaser based on the number of days from the termination date through the last day of such Option year (inclusive), and Option Payments made to Seller that apply to any period prior to such termination date shall be retained by Seller. If Purchaser terminates this Agreement on the designated date for Closing for the reason listed in clause (ii) above, then, in addition to all other remedies provided to Purchaser at law or in equity (including, without limitation, specific performance), the most recent Option Payment made to Seller shall be fully refunded to Purchaser.

(b)    If a Closing occurs, all Option Payments made by Purchaser during the Option Term shall be credited to Purchaser and applied to the Purchase Price (as defined in Section 5.1 below) at Closing.

**ARTICLE IV**
**TERMINATION OF OPTION AND AGREEMENT**

Section 4.1    **Termination Right During Option Term.**    Notwithstanding any other provisions to the contrary set forth in this Agreement and in addition to all other termination rights of Purchaser contained herein, at any time during the Option Term, Purchaser, in its sole and absolute discretion, may terminate the Option and this Agreement earlier than the Expiration Date, for any reason or for no reason at all, by

written notice to Seller that includes the effective termination date selected by Purchaser in its sole and absolute discretion.

**Section 4.2**    **Other Termination.**  Without limiting the other provisions contained in this Agreement, if and when the Closing occurs, the Option and this Agreement shall automatically expire and terminate as of the effective date of the Deed (as defined in Section 10.3 below), except for the provisions that survive any termination or expiration of this Agreement as expressly set forth herein.  If the Option and this Agreement terminate or expire without the Parties having consummated the purchase and sale of the Property as contemplated in this Agreement, then Purchaser will execute and record, at its expense, an affidavit or other document in order to provide notice to third parties of such termination or expiration by recording same in the Real Property Records.  However, despite anything to the contrary that may be contained in any such recorded document, the provisions contained in this Agreement that expressly survive any termination or expiration of the Option and this Agreement shall control over any such other document related to the termination or expiration and shall survive in accordance with such provisions herein.

**ARTICLE V**
**PURCHASE PRICE; CLOSING**

**Section 5.1**    **Purchase Price.**  The purchase price ("**_Purchase Price_**") for the Property shall be calculated as thirteen thousand (**$13,000**) per acre of the Land. The final acreage (measured to the nearest one hundredth (1/100th) of an acre) of the Land shall be determined by the Survey (as defined in Section 6.3(a) below), but less any acreage affected by any partial Condemnation or Casualty at the time of any Closing in accordance with Sections 13.1(c) and 13.2(b) below, respectively.

**Section 5.2**    **Closing.**  In the event Purchaser exercises the Option, the purchase and sale transaction contemplated in this Agreement shall be consummated and closed (the "**_Closing_**") on or before the later to occur of (i) one hundred eighty (180) days after the date of the Option Exercise Notice or (ii) the Expiration Date that was in effect on the date of the Option Exercise Notice, unless the parties mutually agree to extend any such closing period; provided, however, if there is an uncured Seller Default at the end of such period, Purchaser shall have the unilateral right (but not the obligation) to extend such period for up to an additional sixty (60) days (including any and all extensions, the "**_Closing Period_**"), and, in any event, the consummation of the purchase and sale of the Property shall be subject to the conditions precedent to Closing set forth in Article IX below.

**ARTICLE VI**
**DUE DILIGENCE MATTERS**

**Section 6.1**    **Due Diligence Period.**  From the Effective Date through any Closing (the "**_Due Diligence Period_**"), Purchaser shall have the right to review and conduct examinations, investigations, assessments, studies and other research and due diligence activities related to its rights under this Agreement, including, but not limited to, the activities set forth below in the other Sections of this Article VI.

**Section 6.2**    **Seller's Delivery of Property Documents.**

(a)    Within (30) days after the Effective Date, Seller shall deliver to Purchaser legible and complete copies of the following items to the extent that such items relate to the Property and are in the possession or control of, or otherwise readily available to, Seller or any of its affiliates, parents, subsidiaries, shareholders, members, partners, directors, officers, employees, consultants, advisors, agents or representatives:

Page 4 of 20

(i)      (A) reports, studies, tests and/or assessments by Seller and third party consultants, including, but not limited to, physical, environmental, biological, soils, geological, seismic, archaeological, civil engineering, surface water, flooding and groundwater; (B) any *ad valorem* real estate tax bills and assessments for the year immediately preceding the Effective Date; (C) any notices and other correspondence regarding such taxes and assessments or the assessed tax value of the Property for the current year and other real estate tax matters; (D) any information on the most recent tax protest (if any); (E) contracts, licenses, building, occupancy, zoning and other governmental permits and certificates; (F) sewage, drainage and utility agreements; and (G) any other documents and materials related to the Property (collectively, the "***Due Diligence Documents***").

(ii)     unrecorded easements, leases, licenses, rights-of-entry, land use agreements, court orders and other court documents, and all other unrecorded agreements and documents (and all amendments, extensions and other modifications thereto) affecting or encumbering all or any portion of the Property, including, but not limited to, any and all unrecorded oil, gas and/or other mineral leases, water rights or use agreements, surface use and surface waiver agreements, grazing leases, farming and other agricultural leases, hunting leases, conservation program contracts, and any other type of lease, license, right-of-entry, land use agreements or occupancy agreements (collectively, the "***Unrecorded Title Documents***"). All such Unrecorded Title Documents shall be deemed to be "Title Documents" (as defined in Section 6.3(a) below) for all purposes, including under Section 6.3(c) below.

(b)      Seller shall have the continuing obligation throughout the Due Diligence Period to deliver to Purchaser any existing Due Diligence Documents and Unrecorded Title Documents not previously delivered and any new Due Diligence Documents and Unrecorded Title Documents.

**Section 6.3      Title Commitment, Title Documents and Survey.**

(a)      Purchaser, at its expense, may (but is not obligated to) cause a title company selected by Purchaser (the "***Title Company***") to deliver to Purchaser a commitment for the issuance of an owner's title insurance policy covering the Property ("***Title Commitment***") and copies of all recorded title encumbrances reflected by said Title Commitment (collectively, the "***Title Documents***"). At Purchaser's expense, it may (but is not obligated to) cause a survey (in whatever form selected by Purchaser) to be conducted of all or any portion(s) of the Property (the "***Survey***").

(b)      If at any time the Title Commitment (or any updates thereof) shows that fee simple title to all or any part of the Property is not fully vested in Seller, Seller shall immediately and fully cure such title defect (at its sole expense) to the satisfaction of Purchaser and the Title Company, and, if any such ownership is vested in an affiliate of Seller, then Seller shall cause said affiliate to become a party to this Agreement or to enter into a new agreement in the same form and on the same terms as this Agreement with respect to such Property.

(c)      Purchaser shall have the right to notify Seller of any encumbrances affecting all or any part of the Property (whether based on the Title Commitment, the Title Documents, the Survey or otherwise) (each, an "***Encumbrance Notice***") that Purchaser will require Seller to remove or have removed as an encumbrance (collectively, the "***Property Objections***"). If, and each time, Purchaser delivers an Encumbrance Notice to Seller, Seller shall have twenty-five (25) business days after receipt of same to cure the Property Objections contained therein (but in any event such cure period shall end at least twenty (20) business days prior to the end of the Closing Period). The encumbrances to which Purchaser does not object and any uncured Property Objections that are waived by Purchaser prior to any Closing shall be permitted encumbrances in connection with the sale and purchase of the Property and shall be set forth on an Exhibit

to the Deed. Seller shall be responsible for any and all prepayment premiums, document preparation fees, recording fees and other fees charged by mortgagees or other parties in connection with Seller's curing, satisfying or obtaining the release of all monetary liens affecting all or any part of the Property.

**Section 6.4** <u>**Inspections of the Property.**</u>

(a) During and throughout the Due Diligence Period, Purchaser may evaluate, examine, inspect, investigate, assess, research, test, study, record, measure and monitor solar energy resources and other matters relating to, affecting or located on, about, above, under, over, through, across, within and/or at the Property, including, but not limited to, physical, environmental, biological, soils, geological, seismic, archaeological, civil engineering, surface water, flooding and groundwater and the feasibility of Purchaser's desired use of the Property (collectively, the "***Inspections***"). Purchaser, and its consultants, agents, representatives, engineers, inspectors, contractors, employees and other parties and persons acting for, at the request of or on behalf of Purchaser in connection with the Inspections, shall have the right to enter upon the Property, and Seller shall cooperate with Purchaser and such parties and persons in facilitating such access to the Property. Purchaser shall also have the right to remove any landscaping and other vegetation that interferes with its Inspections on the Property. All such Inspections of the Property shall be at Purchaser's sole cost and expense.

(b) In connection with the Inspections, Purchaser shall have the right to install Monitoring Equipment (as defined below) upon the Land and/or use any such existing Monitoring Equipment located upon the Land. As used in this Agreement, the term "***Monitoring Equipment***" means, collectively, anemometers, meteorological towers, solar radiation and solar energy monitoring devices and other weather measurement devices, monitoring and recording equipment and other facilities, together with a land-based or satellite based high speed internet connection and/or a meter for the load (established by Purchaser at its sole discretion and expense) in connection with the Inspections. Seller hereby expressly waives and releases any and all statutory, common law and other liens it may have in the Monitoring Equipment and any other property of Purchaser.

(c) Following the expiration or termination of the Option and this Agreement (except in the event the Closing occurs), Purchaser shall remove, at its expense, all such Monitoring Equipment it installed on the Land and shall return the surface of the Land to substantially the same condition in which it existed prior to the Inspections, except that Purchaser shall have no obligation to restore or replace, or reimburse or compensate Seller for, any trees, shrubs, landscaping or other vegetation damaged or removed from the Land in connection with the Inspections other than payments for damaged or removed crops. The foregoing removal and restoration obligations shall survive the expiration of this Agreement and shall automatically terminate upon Purchaser's fulfillment of such obligations.

**ARTICLE VII**
**COVENANTS**

**Section 7.1** <u>**Confidentiality.**</u>

(a) Seller covenants to maintain in the strictest confidence (i) the terms, conditions and provisions of (including, without limitation, any and all amounts payable under) this Agreement and all other written or oral communications (whether occurring prior to or during the Option Term or Closing Period) concerning or discussing the transactions described in this Agreement, (ii) any information regarding Purchaser's activities at the Property, and (iii) any other information that is proprietary to Purchaser or any other party or person or that Purchaser requests be held confidential, in each such case whether disclosed by Purchaser or discovered by Seller (collectively, the "***Confidential Information***");

however, excluded from the foregoing requirements of confidentiality is any such Confidential Information that is in the public domain by reason of prior publication through no act or omission of Seller.

(b)     Seller shall not use or disclose any Confidential Information for its own actual or foreseeable benefit or publish or otherwise disclose it to any other party or person; provided, however, Seller may disclose Confidential Information, but only to the extent necessary in each instance, (i) to its affiliates, shareholders, members, partners, directors, officers, employees, consultants, agents, attorneys, advisors and potential sources of financing (collectively, the "***Seller's Representatives***") in connection with the transactions described in this Agreement, (ii) to any prospective purchaser of all or any portion of the Property, (iii) to governmental authorities and agencies to obtain, maintain, or renew permits for the Property or (iv) pursuant to lawful process, subpoena or court order, provided that in making any of the foregoing disclosures, Seller advises the party or person receiving the Confidential Information that the same is confidential and requires and obtains the agreement of said party or person not to disclose such Confidential Information.

(c)     Seller acknowledges that it is aware that (i) the Confidential Information being furnished to it contains material, non-public information regarding Purchaser and (ii) the United States and Canadian securities laws prohibit any party or person who have material, non-public information concerning the matters which are the subject of this Agreement from purchasing or selling securities of a company using such Confidential Information or from communicating such Confidential Information to any party or person (including, but not limited to, Seller and all of Seller's Representatives) under circumstances in which it is reasonably foreseeable that such party or person is likely to purchase or sell such securities in reliance upon such Confidential Information.  Seller represents and warrants to Purchaser that Seller has in place internal information protection mechanisms to prevent unauthorized use or disclosure of the Confidential Information.

(d)     All of the provisions of this Section 7.1 shall survive any expiration or termination of the Option and this Agreement and any Closing.

**Section 7.2     Cooperation.**

(a)     From the Effective Date until Closing, Purchaser shall have the right to seek and/or pursue (in its name or, if Seller's name is required, Seller agrees to cooperate with Purchaser in such regard), in its sole discretion and at its sole expense, (i) amendments, revisions or other changes to applicable zoning and any solar use ordinances, statutes, rules and regulations, (ii) a rezoning of the Land, (iii) development approvals, entitlements, tax concessions, consents and permits for Purchaser to develop the Land and use it for Purchaser's intended use after Closing and (iv) hearings or other proceedings and engage in other efforts to permit the development of a solar energy project on the Land; provided, however, none of the forgoing shall be binding upon the Land until any Closing unless Seller agrees otherwise in writing.  Seller shall cooperate in every reasonable way in any such efforts, hearings or proceedings, at no out-of-pocket expense to Seller.  Any such hearing or proceeding, including any maintained in the name of Seller, shall be controlled and directed by Purchaser.  If requested by Purchaser, Seller shall execute letter(s) or other documentation that Purchaser may provide to third parties (including to the city and county or counties in which the Land is located) to evidence Seller's consent to Purchaser's processing of permits, applications, plans, maps and other instruments or entitlements necessary or appropriate with respect to the Land in connection with Purchaser's intended use thereof.  Purchaser shall reimburse Seller for any actual, out-of-pocket costs incurred by Seller in connection with the foregoing assistance by Seller.

(b)     From the Effective Date until Closing, Purchaser shall have the right to seek and/or pursue (in its name or, if Seller's name is required, Seller agrees to cooperate with Purchaser in such regard), in its sole discretion and at its sole expense, surface waivers, accommodation agreements or other instruments

with any party having any interests or rights in the Property, including, without limitation, easement holders, lienholders and any party (including Seller) that owns or leases any oil, gas, mineral or other subsurface interests in and to the Land.  If Seller has a right to terminate any such interests, then, following Purchaser's request that Seller do so, Seller shall so terminate such interests prior to any Closing.  Purchaser shall reimburse Seller for any actual, out-of-pocket costs incurred by Seller in connection with the foregoing assistance by Seller.

(c)     Prior to any Closing, Seller will obtain any and all (i) consents from third parties that Seller is required to obtain in order to consummate the sale and purchase of the Property as contemplated under this Agreement and (ii) releases from any monetary liens that may encumber all or any portion of the Property.  Seller shall take all actions and execute all documents reasonably required by the Title Company in order to consummate the transaction.

**Section 7.3**     **No Transfers or Additional Encumbrances.**  From the Effective Date until any Closing, Seller shall not sell, convey, dispose of, exchange, contribute, gift or otherwise transfer, or in any way further or newly encumber (whether by lien, lease, easement, license or otherwise, including any renewals or extensions thereof), all or any part of (i) the Property, (ii) Seller's oil, gas or other mineral interests therein (if any) or (iii) any of Seller's other rights, title or interests in and to same.  If Seller violates any of the foregoing restrictions, then each such violation will be deemed a Seller Default and all shall be deemed Property Objections that, in each event, Seller must immediately cure, cancel, terminate, revoke or otherwise eliminate, at its sole cost and expense.

**Section 7.4**     **Non-Interference.**  From the Effective Date until any Closing, Seller shall not engage in any activity with respect to the Property that could or does interfere with, interrupt, harm, diminish, hinder, disrupt, disturb, damage and/or otherwise negatively affect or impact (i) the Monitoring Equipment installed on, about or at the Land, (ii) the Inspections or related activities conducted on, about or at the Land or (iii) Purchaser's exercise of any of its rights and interests contained in this Agreement.

**Section 7.5**     **Mineral Operations.**  From the Effective Date until any Closing, Seller shall not (and to the extent Seller has authority, Seller shall not permit any other person or entity to) prospect for, drill, develop or extract any oil, gas, geothermal fluid or minerals of any kind from any portion of the surface of the Land or from any portion of the subsurface of the Land that is less than five hundred feet (500') below the surface grade level of same, without the prior written consent of Purchaser, which may be granted or withheld in Purchaser's sole discretion.  If Seller has any right to select, determine, prohibit or control the location of sites for drilling, exploitation, production and/or exploration of minerals, hydrocarbons, water, gravel, or any other similar resource in, to or under the Land or any other real property owned, leased or occupied by Seller in the vicinity of the Land, Seller shall exercise such right so as to minimize interference with Purchaser's rights under this Agreement to the greatest extent possible.

**Section 7.6**     **Post-Closing.**  From and after any Closing, Seller shall be obligated to provide to Purchaser any and all notices, correspondence, packages, invoices, bills and other materials that Seller may receive (including from governmental authorities) in connection with or that relates to the Property.  Within thirty (30) days after the sale of the Property to Purchaser, Seller shall notify all parties and persons that provide any services to the Property, or with which Seller has any contracts (written or oral) that relate to the Property, that the Property has been sold, which notice shall include the name and mailing address of Purchaser.  The provisions of this Section 7.6 shall survive any Closing.

**ARTICLE VIII**
**REPRESENTATIONS AND WARRANTIES**

**Section 8.1**    **Representations and Warranties of Seller.**    Seller hereby makes the following representations and warranties to Purchaser, each as of the Effective Date (and which shall continue to be true and correct throughout the Option Term until the time of any Closing):

(a)    Seller is the sole owner of fee simple title to the Property and the owner of approximately one hundred percent (100%) of the mineral estate, interests and rights in and to the Property.  No portion of the Property is affected or encumbered by any life estate.

(b)    Seller and the individual(s) that have executed this Agreement on its behalf have the right, power, legal capacity and authority to execute, deliver and perform this Agreement without the joinder of any other person or entity, and any consent required as a condition to the authority of Seller to execute, deliver and perform this Agreement has been obtained. This Agreement constitutes the valid, binding and enforceable obligation of Seller.

(c)    There is no action, suit or proceeding initiated, pending or, to the best of Seller's knowledge, threatened against the Property, or against Seller regarding, concerning or potentially impacting or affecting all or any portion of the Property or any of Seller's rights, title or interests therein, in any court, arbitration proceeding or by or before any governmental agency or instrumentality.  Seller has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy, admitted in writing its inability to pay its debts as they come due or made an offer of settlement, extension or composition to its creditors generally.  Seller has not received any written notice of (i) the filing of an involuntary petition by Seller's creditors, (ii) the appointment of a receiver to take possession of all, or substantially all, of Seller's assets or (iii) the attachment or other judicial seizure of all, or substantially all, of Seller's assets.

(d)    Neither the entering into of this Agreement nor the performance of any of Seller's obligations under this Agreement will (i) violate, in any material respect, any laws affecting the Property nor (ii) violate the terms of any contract, lease, easement or other agreement or instrument to which Seller is a party.  Seller has not received any notice that all or any portion of the Property is in violation of any applicable law, statute, ordinance, regulation, rule or governmental order.

(e)    Except as reflected in the Real Property Records or listed on **Exhibit C** attached hereto, there are (i) no conservation reserve program contracts or similar contracts relating to the Property, (ii) no leases, licenses, easements, rights-of-way or other rights relating to the use or possession of all or any portion of the Property, including, without limitation, no farming, hunting, grazing or recreational leases, licenses or similar agreements, (iii) no contracts or other agreements related to the Property that would be binding on the Property or Purchaser from and/or after any Closing, (iv) no adverse or other parties are in possession of all or any portion of the Property and (v) no third parties hold any other rights or interests in or to the Property or any portion thereof.  The Property is not currently enrolled in any tax abatement program.

(f)    To the best of Seller's knowledge, no default or breach exists under any of the leases, easements, contracts, agreements, covenants, conditions or restrictions encumbering or otherwise affecting all or any portion of the Property.

(g)    Seller has not previously sold, conveyed, exchanged, contributed, gifted or otherwise transferred all or any portion of the Property or any of Seller's rights, title or interests therein, and Seller has not entered into any executory contracts or made other agreements for the sale, conveyance, exchange, contribution, gift or other transfer of all or any portion of the Property or any of Seller's rights, title or interests therein, nor does there exist any rights of first refusal or options to purchase, repurchase, lease, obtain an easement in, or occupy all or any portion of the Property (other than this Agreement).

(h)     Except as reflected in the Real Property Records, the Property is free and clear of (i) any liens and encumbrances granted by Seller and (ii) any lease, easement, agreement or other instrument that could have the effect of causing the termination of this Agreement or any other instrument that may be entered into pursuant to this Agreement.

(i)     To the best of Seller's knowledge, (i) no garbage, refuse or solid waste has been dumped, buried, landfilled or otherwise stored under or on the Property (other than typical household garbage or landscaping waste) and (ii) the Property does not contain any hazardous materials or hazardous waste (collectively, "***Hazardous Materials***") or violate any applicable laws relating to such Hazardous Materials. Seller has not placed, stored, released, transported or otherwise used Hazardous Materials on or below the surface of the Property. Neither the Property nor Seller is currently subject to any existing, pending, or threatened investigation or inquiry by any governmental authority relating to environmental laws or to any remedial obligations under such laws or subject to any reclamation or restoration requirements imposed by any governmental authority. The Property does not contain any underground storage tanks.

(j)     There has been no material or labor furnished or provided to Seller at or for any part of the Property for which payment has not been made or will not be made by Seller prior to any Closing, and, to the best of Seller's knowledge, there are no mechanics' or materialmen's liens or claims filed against the Property.

(k)     Seller has not had (and does not have) any commissioned broker or agent representing Seller in connection with the Option and/or this Agreement.

(l)     All persons (including spouses) having any ownership, community property, life estate or similar possessory interest in the Property are executing this Agreement. The spouse (if any) signing this Agreement agrees that any right of homestead, dower, contribution and the like shall be subject and subordinate to this Agreement and to all of Purchaser's rights and interests herein.

**Section 8.2     Representations and Warranties of Purchaser.** Purchaser hereby makes the following representations and warranties to Seller, each as of the Effective Date (and which shall continue to be true and correct throughout the Option Term until the time of any Closing):

(a)     Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Purchaser and the individual(s) that have executed this Agreement on its behalf have the right, power, legal capacity and authority to execute, deliver and perform this Agreement, and any consent required as a condition to the authority of Purchaser to execute, deliver and perform this Agreement has been obtained.

(b)     There is no action, suit or proceeding initiated, pending or, to the best of Purchaser's knowledge, threatened against Purchaser in any court or arbitration proceeding or by or before any governmental agency or instrumentality which would materially and adversely affect the ability of Purchaser to carry out the transactions contemplated by this Agreement. Purchaser has not made a general assignment for the benefit of creditors, filed any voluntary petition in bankruptcy, admitted in writing its inability to pay its debts as they come due or made an offer of settlement, extension or composition to its creditors generally. Purchaser has not received any written notice of (i) the filing of an involuntary petition by Purchaser's creditors, (ii) the appointment of a receiver to take possession of all, or substantially all, of Purchaser's assets, or (iii) the attachment or other judicial seizure of all, or substantially all, of Purchaser's assets.

**Section 8.3     Survival.** The representations and warranties of Seller and Purchaser set forth in this Agreement shall survive any Closing for a period of four (4) years.

Page **10** of **20**

### ARTICLE IX
### CONDITIONS PRECEDENT TO CLOSING

**Section 9.1** <u>**Purchaser's Conditions Precedent to Closing.**</u>  If Purchaser exercises the Option, the obligation of Purchaser to purchase the Property at Closing is contingent upon Seller satisfying all of the following conditions precedent to Closing (any of which conditions may be waived by Purchaser in its discretion):

(a)  No matter exists or is pending or threatened that might, in Purchaser's reasonable opinion, have an adverse effect on all or any part of the Property and/or Purchaser's use thereof.

(b)  No Condemnation is actual, pending or threatened and no Casualty is actual or threatened with respect to all or any part of the Property.

(c)  All of the representations and warranties (and all factual statements, regardless of Seller's knowledge thereof) contained in <u>Section 8.1</u> above shall be true and accurate.

(d)  Seller has obtained all consents, approvals and authorizations from all persons and entities that Seller is required to obtain in order for Seller to have the right and authority to sell the Property to Purchaser, all of which shall be valid and in full force and effect.

(e)  Any and all monetary liens and/or security interests affecting all or any part of the Property shall be fully paid and released.

(f)  Since the Effective Date, neither Seller nor any party claiming under Seller shall have encumbered the Property with any liens, easements, leases or other matters or encumbrances (including, but not limited to, any mineral conveyance or lease), and no material loss or other adverse change shall have occurred with respect to the Property.

(g)  The Property is in the same physical condition as now exists, subject only to ordinary wear and tear occurring after the Effective Date.

(h)  Seller shall have satisfied all obligations of Seller required by the terms of this Agreement and performed all covenants and agreements of Seller required by the terms of this Agreement and no uncured Seller Default shall exist.

(i)  There shall be no Property Objections that Purchaser has not previously waived in writing.

(j)  Unless Purchaser has expressly notified Seller in writing that Purchaser accepts one or more items of Seller's personal property remaining on the Land, all personal property of Seller shall have been removed from the Land.

(k)  No material change shall have occurred or be threatened with respect to all or any part of the Property which would adversely affect, alter or impact the findings of Purchaser through its Inspections and other due diligence activities.

(l)  Seller has delivered to Purchaser and/or to the Title Company all of Seller's Closing deliverables set forth in <u>Section 10.2</u> below.

(m)  Purchaser shall have received a final pro forma title insurance policy obligating the Title Company to issue an owner's title insurance policy to Purchaser, identifying the permitted encumbrances

affecting the Property and providing extended coverage over the standard or general exceptions and endorsements required by Purchaser and in form and substance satisfactory to Purchaser (the "***Pro Forma Title Policy***").

       (n)     Purchaser shall have received a final Survey showing the locations of all encumbrances and exceptions to the Property listed in the Pro Forma Title Policy that are capable of being shown on a survey.

       (o)     Purchaser shall have obtained all zoning, development, tax and other approvals and agreements necessary or desired by Purchaser for Purchaser's intended use of the Property.

**Section 9.2**     **Seller's Conditions Precedent to Closing.** If Purchaser exercises the Option, the obligation of Seller to sell the Property at Closing is contingent upon Purchaser satisfying all of the following conditions precedent to Closing (any of which conditions may be waived by Seller in its discretion):

       (a)     No Purchaser Default (as defined in Section 14.2(a) below) remains uncured as of Closing.

       (b)     Purchaser has delivered to the Title Company all of Purchaser's Closing deliverables set forth in Section 10.1 below.

**Section 9.3**     **Failure of Conditions Precedent to be Satisfied.** If, on the date designated for Closing, any of a Party's conditions precedent (as set forth above in this Article IX) to its obligation to close has not been satisfied, then such Party may, in its sole discretion, (i) waive such unsatisfied conditions and proceed to close the sale and purchase of the Property or (ii) exercise the remedies expressly provided to such Party under Article XIV of this Agreement.

### ARTICLE X
### CLOSING DELIVERABLES; PRORATIONS; CLOSING COSTS

**Section 10.1**     **Purchaser Deliveries for Closing.** Prior to or at any Closing, Purchaser shall deliver (or cause to be delivered) to the Title Company, the following items (with items (b)-(d) being duly executed and/or acknowledged by Purchaser):

       (a)     the Purchase Price, less any and all credits thereto due to Purchaser (including the Option Payments), by wire transfer of funds;

       (b)     if required from Purchaser, a real estate transfer tax declaration or declarations in the form required by law;

       (c)     a copy of a closing or settlement statement prepared by the Title Company (which shall itemize all costs and fees to be paid or credited at Closing) (the "***Closing Statement***"); and

       (d)     such other documents (if any) that are customarily executed in the state in which the Land is located by purchasers in connection with the acquisition of real property, including all required closing statements, affidavits and any other documents or instruments that may be reasonably required by the Title Company.

**Section 10.2** <u>**Seller Deliveries at Closing**</u>. At Closing, Seller shall deliver (or cause to be delivered) to the Title Company (except that items (k)-(m) shall be delivered to Purchaser), the following items (with items (a)-(h) being duly executed and/or acknowledged by Seller):

      (a)     an original of a Deed that complies with the requirements of <u>Section 10.3</u> below;

      (b)     if applicable, an original bill of sale in form and substance reasonably satisfactory to Purchaser for any of Seller's personal property Purchaser expressly agrees in writing to allow to remain on the Land;

      (c)     a personal undertaking or GAP indemnity (or equivalent document required by the Title Company);

      (d)     if required from Seller, a real estate transfer tax declaration or declarations in the form required by law;

      (e)     a closing certificate stating that, as of Closing, each of Seller's representations and warranties set forth in this Agreement is true and correct, except for any changes thereto previously disclosed to and expressly approved in writing by Purchaser;

      (f)     a certificate of non-foreign status that meets the requirements of Section 1445 of the Internal Revenue Code;

      (g)     a copy of the Closing Statement;

      (h)     other documents (if any) that are customarily executed by sellers in the state in which the Land is located in connection with the conveyance of real property, including all required closing statements, releases, affidavits, and any other instruments that may be reasonably required by the Title Company.

      (i)     a lien release from each holder or claimed holder of each monetary lien or indebtedness that affects all or any part of the Property, duly executed and acknowledged by such holder and otherwise in form acceptable to Purchaser and the Title Company;

      (j)     corporate, trust, power of attorney or estate authority documents as may be required by the Title Company;

      (k)     possession of the Property to Purchaser (together with any gate or other entry keys and codes), free and clear of all tenants or other parties in possession;

      (l)     any and all Due Diligence Documents and/or Unrecorded Title Documents not previously delivered to Purchaser; and

      (m)     to the extent not previously provided to Purchaser, the names, mailing addresses and any other contact information for any and all parties and persons that provide services to the Property or with which Seller has a contract or other agreement (whether written or oral) that relates to the Property.

**Section 10.3** <u>**Warranty Deed**</u>. Seller shall execute and deliver to Purchaser at Closing a general warranty deed to the Property, in recordable form and otherwise in substance satisfactory to Purchaser and the Title Company, conveying to Purchaser good and marketable fee title to the Property, subject only to those matters shown on the final Pro Forma Title Policy issued by the Title Company in conjunction with

Closing (the "**_Deed_**"). If one or more married individuals constitute the Seller hereunder, then their respective spouses shall join in and execute the Deed, whether or not said spouses hold any fee or other interests in the Property.

**Section 10.4** **Prorations.**

(a) Seller shall pay all transfer taxes and/or documentary stamp taxes arising from the purchase transaction.

(b) All taxes relating to the Property for the years prior to the year of Closing shall be paid in full by Seller. All taxes relating to the Property for the year of Closing shall be prorated between Seller and Purchaser as of the date of Closing (such proration to be based on the amount of taxes for the year prior to Closing), and Purchaser shall receive a credit against the Purchase Price equal to Seller's prorated tax amount. Following Closing, each Party shall have the right to seek reimbursement from the other Party for any overpayment of taxes attributable to the year of Closing. In all cases, Seller shall be responsible and liable for all taxes attributable to any period prior to the date of Closing, and Purchaser shall be responsible and liable for all taxes attributable to any period from and after the date of Closing. The obligations under this Section 10.4 shall survive Closing.

(c) In no event shall Purchaser shall be charged with or required or obligated to pay any income, capital levy, capital gains, estate, succession, inheritance or similar taxes of Seller or any of its affiliates or any income, profits, gross or net receipts, revenue or franchise taxes, assessments or any other charges or fees imposed upon Seller in connection with the Option Payments or the Purchase Price paid to Seller or any other benefit paid to or received by Seller under this Agreement.

(d) In the event that as a result of the sale or use of the Land by Purchaser, including any change in the zoning classification requested by Purchaser or attributable to Purchaser's use, there is an increase in the real estate taxes attributable to the Loan or an CAUV recoupment must be paid, Purchaser shall be responsible for the payment of the same. The forgoing obligation of Purchaser shall survive the closing of the transaction contemplated herein.

**Section 10.5** **Parties' Closing Costs.**

(a) Seller agrees to pay (i) all costs and fees incurred by Seller (or billed to Seller by a third party for work done on behalf of Seller) in preparing, reviewing, obtaining and/or recording all of Seller's closing and other documents required under this Agreement or otherwise necessary to convey the Property to Purchaser, except as may be expressly stated otherwise in this Agreement; (ii) all of its legal and mortgage costs and fees; (iii) all state, county and local real property conveyance fees and similar real property transfer taxes in connection with the conveyance; (iv) all income, profit or other taxes and fees levied upon or charged to Seller in connection with the proceeds it or any other party receives for the sale of the Property to Purchaser; and (v) all taxes allocated to Seller under Section 10.4 above.

(b) Purchaser agrees to pay (i) all costs and fees incurred by Purchaser (or billed by a third party for work done on behalf of Purchaser) in preparing, reviewing, obtaining and/or recording all of Purchaser's closing and other documents required under this Agreement or otherwise necessary to purchase the Property from Seller, except as may be expressly stated otherwise in this Agreement; (ii) all of its legal and mortgage costs and fees; (iii) all Survey costs; (iv) all Title Commitment, Pro Forma Title Policy and final title policy costs and fees; (v) all escrow and closing fees charged by the Title Company; and (vi) all taxes allocated to Purchaser under Section 10.4 above.

(c)     **Other Closing Costs.**  Any other closing costs and fees not specifically allocated to Seller or Purchaser herein shall be allocated between the Parties in accordance with the customary practices for similar real property transactions in the state, county and/or city in which the Land is located.

## ARTICLE XI
## INDEMNIFICATION AND LIMITATION OF LIABILITY

**Section 11.1     Indemnification.**

(a)     Each Party shall indemnify and hold the other Party harmless from and against all claims, lawsuits, legal actions and legal proceedings (collectively, "***Claims***") that are brought or instituted against the indemnified Party (and the indemnifying Party shall be responsible for the actual, out-of-pocket costs and expenses, including court costs and reasonable attorneys' fees (collectively, "***Indemnified Amounts***"), incurred by the indemnified Party in connection with the Claims) as a result of any injuries or damages to persons (including death) or property to the extent attributable to, resulting from or caused by (i) a breach of this Agreement by the indemnifying Party and/or (ii) any negligence or willful misconduct on the part of the indemnifying Party (or any party or person acting on its behalf) at the Property.

(b)     Notwithstanding the foregoing and all other provisions contained in this Agreement, neither Party shall indemnify or hold the other Party harmless from or against Claims or Indemnified Amounts, or be in any way responsible or liable to any of them or any other party or person, attributable to, resulting from or caused by the negligence or willful misconduct of the other Party or any of its agents, representatives, contractors, consultants, employees or any other party or person acting for or on its behalf.

**Section 11.2     Indemnification for Property Matters.**

(a)     Seller shall indemnify and hold Purchaser harmless from and against Claims and Indemnified Amounts on account of Purchaser uncovering, discovering, revealing or identifying any pre-existing (whether known, unknown, or latent) environmental, biological, regulated or physical conditions or defects on, about, above, over, under, through, across, within or at the Property.

(b)     Seller shall indemnify and hold Purchaser harmless from and against any and all unpaid balances of all contracts, licenses, fees and expenses of any kind in connection with the maintenance or operation of the Property or any part thereof prior to any Closing, regardless of when such unpaid balances are discovered.

(c)     Seller shall indemnify and hold Purchaser harmless from and against any Claims of all mechanics, materialmen, contractors and subcontractors relating to the Property and applicable to any period prior to any Closing (except for any Claims arising from Purchaser's activities on the Land during the Due Diligence Period), regardless of when such Claims are discovered.

**Section 11.3     Survival.**  All indemnification rights and obligations of Seller and Purchaser set forth in this Agreement shall survive this Agreement and/or any Closing for a period of four (4) years.

**Section 11.4     Waiver of Consequential and Certain Other Damages.**   Notwithstanding anything to the contrary contained herein, the Parties hereby acknowledge and agree that it is the intent that, neither Seller nor Purchaser, nor their respective officers, directors, partners, members, trustees, beneficiaries, shareholders, agents, employees, contractors, consultants, successors or assigns, shall be liable to the other Party or to its officers, directors, shareholders, partners, members, trustees, beneficiaries, agents, employees, contractors, consultants, successors or assigns for

Page **15** of 20

CLAIMS FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES OF ANY NATURE CONNECTED WITH OR RESULTING FROM PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT, REGARDLESS OF WHETHER SUCH CLAIMS ARE BASED UPON NEGLIGENCE, STRICT LIABILITY, CONTRACT, OPERATION OF LAW OR OTHERWISE.

**Section 11.5** <u>**Waiver of Jury Trial**</u>. EACH PARTY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ITS RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED ON, ARISING OUT OF, UNDER, RELATING TO OR IN CONNECTION WITH THIS AGREEMENT.

## ARTICLE XII
## ASSIGNMENT

Purchaser shall have the right to assign, transfer or convey (actually or collaterally) the Option and this Agreement, in whole or in part, without the consent of Seller (each, an "*<u>Assignment</u>*"). An assignee shall succeed to all (if a full Assignment) or a portion (if a partial Assignment) of the rights, interests and obligations of Purchaser under this Agreement. Seller agrees that, upon any full Assignment by Purchaser to the assignee, Purchaser shall be deemed released from all obligations of "Purchaser" under this Agreement as of the effective date of such Assignment, but only if the assignee assumes (in writing) all such obligations under this Agreement as of such date. Purchaser shall give Seller notice of an Assignment promptly following the effective date thereof; provided, however, the failure to give such notice shall not constitute a default by Purchaser, but rather shall only have the effect of not binding Seller hereunder with respect to recognizing the rights of such assignee until such notice shall have been given. Seller hereby consents to the recordation of the Assignment in the Real Property Records.

## ARTICLE XIII
## CONDEMNATION AND CASUALTY

**Section 13.1** <u>**Condemnation; Right to Terminate.**</u>

(a) If at any time prior to Closing (whether before or after the date of any Option Exercise Notice), any authority having the power of eminent domain condemns or takes (or initiates proceedings therefor or informs Seller of such authority's desire to purchase, acquire, condemn or take) all or any portion of the Land for any public use or otherwise (each, and whether actual, pending or threatened, a "*<u>Condemnation</u>*"), Purchaser shall have the right to terminate this Agreement. If such termination occurs during the Option Term, then any Option Payments made for the Option year in which such termination occurs shall be partially refunded to Purchaser in accordance with the terms of <u>Section 3.2(a)</u> above and the removal and restoration obligations set forth in <u>Section 6.4(c)</u> above shall apply unless the condemning authority prevents Purchaser from conducting such removal and restoration activities on the Land (and the rights and obligations contained in this sentence shall survive any termination of this Agreement).

(b) If at any time prior to Closing (whether before or after the date of any Option Exercise Notice), Seller is contacted by, or receives any correspondence or offer from, any condemning authority with respect to all or any part of the Land, Seller shall immediately notify Purchaser in writing and include a copy of any such correspondence and/or offer. Seller shall not accept any such offer or agree to a conveyance in lieu of a condemnation or taking (or otherwise settle same) without the prior written consent of Purchaser.

(c) If after the date of the Option Exercise Notice, any Condemnation (whether actual, pending or threatened) applies or will apply to less than all of the Land and Purchaser elects to proceed to Closing on the remainder of the Land, Purchaser shall have a right to revise the amount of acreage it wishes to purchase, and the Purchase Price shall be calculated based on the acreage actually purchased at Closing.

**Section 13.2**     __Casualty; Right to Terminate__.

(a)     If at any time prior to Closing (whether before or after the date of any Option Exercise Notice), any event occurs or is threatened (including, but not limited to, fire, flood, earthquake, erosion, sinkhole, tornado, hurricane or mudslide) that does or could alter or impact the physical condition of all or any part of the Land (each, and whether actual or threatened, a "__*Casualty*__"), Purchaser shall have a right to terminate this Agreement. If such termination occurs during the Option Term, then any Option Payments made for the Option year in which such termination occurs shall be partially refunded to Purchaser in accordance with the terms of Section 3.2(a) above and the removal and restoration obligations set forth in Section 6.4(c) above shall apply unless the Casualty prevents Purchaser from conducting such removal and restoration activities on the Land (and the rights and obligations contained in this sentence shall survive any termination of this Agreement).

(b)     If after the date of the Option Exercise Notice, any Casualty (whether actual or threatened) applies or will apply to less than all of the Land and Purchaser elects to proceed to Closing on the remainder of the Land, Purchaser shall have a right to revise the amount of acreage it wishes to purchase, and the Purchase Price shall be calculated based on the acreage actually purchased at Closing.

**ARTICLE XIV**
**EVENTS OF DEFAULT**

**Section 14.1**     __Seller Default__.

(a)     Seller shall be in default of this Agreement (each, a "__*Seller Default*__") if it fails to meet any of its monetary obligations or non-monetary obligations under this Agreement and does not cure such breach within thirty (30) days after Seller has knowledge of such breach (whether by notice from Purchaser or otherwise); provided, however, if it is a non-monetary breach, Seller may have up to an additional forty-five (45) days to cure such default if Purchaser agrees to such extension, which agreement shall not be unreasonably withheld (each, a "__*Seller Cure Period*__"); and provided, however, in the event of any and each breach by Seller of Sections 6.3(b), 7.1, 7.3, 7.4, 7.5, 10.2 or 10.3 above, Seller shall have no right to any Seller Cure Period, and Purchaser shall have the right to take immediate action under this Section 14.1 for each such Seller Default and without any prior notice to Seller being required thereunder. Notwithstanding the foregoing, in no event shall any Seller Cure Period extend beyond the date that is twenty (20) business days prior to the Expiration Date or end of the Closing Period.

(b)     At any time a Seller Default exists that has extended beyond its permitted Seller Cure Period, Purchaser may pursue or commence (after Purchaser provides Seller with thirty (30) days prior written notice of Purchaser's intent to do same, which notice shall not be required if Seller breaches Sections 6.3(b), 7.1, 7.3, 7.4, 7.5, 10.2 or 10.3 above) any actions and remedies (in addition to any contractual remedies set forth in this Agreement, including to terminate this Agreement) that may be available to Purchaser at law or in equity, including, without limitation, specific performance. In addition, Purchaser shall have the right to cure such Seller Default, and Seller shall reimburse Purchaser, within thirty (30) days after Seller's receipt of a written demand therefor, the costs expended or incurred by Purchaser to cure same.

(c)     The Parties acknowledge and agree that (i) Purchaser would be irreparably harmed by a breach by Seller of the provisions of Sections 6.3(b), 7.1, 7.3, 7.4, 7.5, 10.2 or 10.3 above, (ii) an award of damages would be inadequate to remedy such a breach, and (iii) Purchaser shall be entitled to equitable relief, including, without limitation, specific performance and/or injunctive relief, to compel Seller's compliance with all such provisions.

**Section 14.2**    **Purchaser Default.**

(a)    Purchaser shall be in default of this Agreement (each, a "***Purchaser Default***") if it (i) fails to pay any sum if and when due from Purchaser under this Agreement and does not cure such monetary default within thirty (30) days after Purchaser has knowledge of such breach (whether by notice from Seller or otherwise) or (ii) fails to meet any of its non-monetary obligations under this Agreement and does not cure such default prior to its exercise of the Option (if such default occurs during the Option Term) or prior to the expiration of the Closing Period (if such default occurs during the Closing Period).

(b)    At any time a Purchaser Default exists that has extended beyond its permitted Purchaser Cure Period, Seller's only remedies shall be (i) if it is a non-monetary Purchaser Default, to terminate this Agreement and (ii) if it is a monetary Purchaser Default, to terminate this Agreement and pursue or commence an action against Purchaser for payment of any sums due and payable from Purchaser under this Agreement but not yet paid at the time of the commencement of any such action; provided, however, Seller shall give Purchaser thirty (30) days prior written notice of any of the foregoing actions contemplated by Seller.  In each instance, Seller shall retain the full amount of all Option Payments previously made by Purchaser.

(c)    Seller hereby waives any and all other rights and remedies not specifically stated in Section 14.2(b) above that it may otherwise have at law or in equity, with such waiver including, without limitation, the waiver of any right or remedy of specific performance by Purchaser, and Seller agrees not to initiate, commence or pursue any such other actions or remedies.

## ARTICLE XV
## NOTICES

Except as provided otherwise in Section 2.2(b) above, all written notices and demands of any kind that either Party may be required or may desire to serve upon the other Party in connection with this Agreement may be served by (i) personal service, (ii) registered or certified U.S. mail or (iii) next day overnight delivery service.  Any such notice or demand shall be addressed to the other Party at the addresses for such Party listed below.  Service of any such written notice or demand shall be deemed complete (i) upon receipt in the event of personal service, (ii) on the second (2nd) business day after the day it is mailed as registered or certified U.S. mail and (iii) on the next business day if sent via an overnight delivery service. All such written notices and demands sent via registered or certified U.S. mail or overnight delivery service shall be sent postage, pre-paid by the sender in order for it to be considered in compliance with this Article XV.

To Seller:              Robert E. Stoll, II
                        1909 E Sr 22-3
                        Morrow, OH 45152
                        Telephone:
                        Email:


With copy to (if applicable):


                        Telephone:
                        Email:

To Purchaser:              Clinton Solar LLC
1088 Sansome Street
San Francisco, California 94111
Attention: General Counsel
Telephone: (415) 283-4014
Email: generalcounsel@patternenergy.com

With copy to:            Pattern Energy Group
1088 Sansome Street
San Francisco, California 94111
Attention: Jenn Ritchey, Business Development
Telephone: (415) 283-4023
Email: jenn.ritchey@patternenergy.com

Any Party, by written notice to the other Party in the manner provided herein, may designate an address or addresses different than those set forth above for such Party, provided that the other Party shall not be bound by any such different address(es) unless and until it receives same.

**ARTICLE XVI**
**GENERAL PROVISIONS**

**Section 16.1**    **Municipal Officer.** Seller represents and warrants that Seller is not a Municipal Officer (defined herein) of the county or any municipality in which the Property is located. "*Municipal Officer*" means any officer or employee of any such county or municipality, whether paid or unpaid, and includes, without limitation, members of any office, board, body, advisory board, council, commission, agency, department, district, administration, division, bureau or committee of any such county or municipality whose official duties involve discretionary decision-making with respect to the Purchaser's Energy Development (defined herein). "*Energy Development*" means any stage of present or future development or siting of energy developments, power and related facilities or energy projects, whether considered, planned, attempted or completed, including but not limited to permitting, licensing, construction and energy production. Municipal Officer also includes any entity that is directly or indirectly controlled by, or is under common control with, such officer or employee. However, Municipal Officer shall not include: (a) a judge, justice, officer or employee of the local court system; (b) a volunteer firefighter or civil defense volunteer, except a fire chief or assistant fire chief; or (c) a member of an advisory board of the county or municipality if, but only if, the advisory board has no authority to implement its recommendations or to act on behalf of the county or municipality or to restrict authority of the municipality to act. Seller further represents and warrants that Seller is not a Relative (defined herein) of a Municipal Officer. "*Relative*" shall mean a spouse or domestic partner of the Municipal Officer, or a person claimed as a dependent on the Municipal Officer's latest individual state income tax return. If Seller is a Municipal Officer, Seller agrees to recuse itself from participating in any vote or other discretionary decision making action with respect to Purchaser's Energy Development. Seller agrees to promptly notify Purchaser in writing if at any time it becomes or any Relative becomes a Municipal Officer. Seller agrees to indemnify Purchaser against any loss, liability or damages, including attorneys' fees, directly or indirectly resulting from any misrepresentation by Seller or failure by Seller to notify Purchaser as set forth above under this Section.

**Section 16.2**    **Certain Costs and Expenses.** Each Party shall be responsible and liable for its own costs and expenses (including, but not limited to, any legal, accounting, brokerage and consultant fees) in connection with the negotiation of this Agreement and all other matters related to this Agreement, subject to the indemnification provisions contained elsewhere in this Agreement.

**Section 16.3**     **Entire Agreement**.     This Agreement, together with the Exhibits attached hereto, supersedes any prior agreement or understanding between the Parties and contains the entire agreement of the Parties concerning the subject of this Agreement.

**Section 16.4**     **Governing Law.**  This Agreement shall be governed by the laws of the State in which the Land is situated, without regard to any conflicts of law principles to the contrary.

**Section 16.5**     **Counterpart Originals.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

**Section 16.6**     **Paragraph Headings**.  The paragraph headings are inserted herein only as a matter of convenience and for reference and in no way are intended to be a part of this Agreement or to define, limit, or describe the scope or intent of this Agreement or the particular section or paragraphs hereof to which they refer.

**Section 16.7**     **Severability**.  If any provision or a portion of any provision of this Agreement is held to be unenforceable or invalid by a court of competent jurisdiction, the validity and enforceability of the enforceable portion of any such provision and/or the remaining provisions shall not be affected thereby.

**Section 16.8**     **Covenants Running with the Land**.  The Option and this Agreement (and the terms hereof) shall constitute real rights and covenants touching, concerning and running with and burdening the Property and shall be binding upon all persons and parties claiming any interest in the Property or any portion thereof, including, without limitation, Seller and its successors and assigns and, if applicable, any such Party's heirs, executors, administrators and personal representatives.

**Section 16.9**     **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns, except to the extent Purchaser may be released herefrom pursuant to Article XII above.  Whenever a reference is made herein to either Party, such reference shall include the Party's successors and assigns, and, if applicable, such Party's heirs, executors, administrators and personal representatives.

**Section 16.10**   **No Partnership.**  Nothing herein contained shall make, or be construed to make, Purchaser or Seller a partner of one another, nor shall this Agreement be construed to create a partnership or joint venture between the Parties hereto.

**Section 16.11**   **No Waiver.**  The failure of any Party to enforce any of the provisions of this Agreement, or any rights with respect hereto, or the failure to exercise any election provided for herein, will in no way be considered a waiver of such provisions, rights, or elections, or in any way affect the validity of this Agreement.  The failure of any Party to enforce any of such provisions, rights, or elections will not prejudice such Party from later enforcing or exercising the same or any other provisions or rights or elections that it may have under this Agreement or at law or in equity.

**Section 16.12**   **Legal Review.**  Each Party acknowledges that it has been afforded sufficient time to review and to understand the terms and effects of this Agreement and to submit it to legal counsel of its choosing for review and advice.  Each Party represents that the agreements and obligations in this Amendment are made voluntarily, knowingly and without duress.

**Section 16.13**   **Time is of the Essence**.  Time is of the essence in this Agreement.

*[Signature page follows this page]*

Page **20** of **20**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized representatives.

**SELLER:**

Signature: _Robert E. Stoll II_

Printed Name: **Robert E. Stoll, II**

### State of Ohio Statutory Short Form of Acknowledgment

STATE OF _Ohio_
COUNTY OF _Clinton_

The foregoing instrument was acknowledged before me this _2nd_ day of _July_, 20_20_, by Robert E. Stoll, II, a single man.

(NOTARY SEAL)

BRENT M RIGGLE
Notary Public, State of Ohio
My Commission Expires
March 12, 20_22_

Signature: _Brent M. Riggle_
Printed Name: _Brent M. Riggle_
Notary Public in and for the State of _Ohio_
My Commission Expires: _3-12-2022_

**PURCHASER:**

**CLINTON SOLAR LLC**

By: _____
Name: _Blake Rasmussen_
Title: _Authorized Signatory_

STATE OF TEXAS

COUNTY OF HARRIS

The foregoing instrument was acknowledged before me this _15_ day of _July_, 20_20_ by _Blake Rasmussen_, as _Authorized Signatory_ of CLINTON SOLAR LLC, a Delaware limited liability company, on behalf of the limited liability company.

(NOTARY SEAL)

EMILY MCCLARY DAVIS
Notary Public, State of Texas
Comm. Expires 03-15-2021
Notary ID 131046982

Signature: _Emily McClary Davis_
Printed Name: _Emily McClary Davis_
Notary Public in and for the State of Texas
My Commission Expires: _3-15-2021_

Signature Page

## EXHIBIT A

### Description of the Land

Approximately **44.279 acres** of land, more or less, situated in the Township of Clark, County of Clinton and State of Ohio, being Clinton County Tax Map Parcel Number 070030702000000 and being more particularly described by that certain deed dated November 19, 1998 from Paul Allen Kelly and Joyce A. Kelly to Robert E. Stoll, II, recorded at Instrument Number 1998-00009703 on December 2, 1998 in the Office of the Recorder of Deeds of the aforementioned County and State and being more fully described as follows:

Situate in Clark Township, Clinton County, Ohio and being a part of Military Survey No. 1939 and bounded and described as follows:

Beginning at a nail (found) in the center of State Route 350 at the Northeasterly corner of a 9.678 Acre Tract as recorded in Volume 28, Plat No. 127, of the Clinton County Engineers Record of Land Division: Running thence, from said point of beginning, with the lines of a 136.50 Acre Tract as recorded in Volume 9, Page 423, of the Clinton County Surveyors Record in State Route 350, on the following courses: (1) N 74°20'43" E 402.81 feet to a nail (found); (2) N 81°46'00" E 345.30 feet to a nail (set); thence, by a new division line, S 3°15'26" E (passing a 5/8" iron pin (set) at 30.00 feet) a distance of 2147.01 feet to a 5/8" iron pin (set); thence, with the lines of the aforesaid 136.50 Acre Tract, on the following courses: (1) N 87°47'09" W 1186.54 feet to a 5/8" iron pin (set); (2) N 2°51'42" W (passing a 5/8" iron pin (set) at 308.82 feet) a distance of 353.82 feet to a point; thence with the lines of the aforesaid 9.678 Acre Tract in a stream, on the following courses: (1)  N 33°21'36" E 524.32 feet to a point (witness a 5/8" iron pin (set) bears N 88°50'00" E 35.00 feet); (2) N 2°38'11" W 796.10 feet to a point (witness a 5/8" iron pin (set) bears N 78°47'00" E 28.00 feet); (3) N 15°49'06" E 366.89 feet to the point of beginning, containing Forty Four and Two Hundred Seventy Nine Thousandths (44.279) Acres. Subject to all legal highways and easements of record.

This description is the result of a new survey made under the direction of Richard D. Roll, Registered Surveyor No. 4957, by CLINCO AND SUTTON SURVEYORS, Wilmington, Ohio, in October 1998, as recorded in Volume 29, Plat No. 197, of the Clinton County Engineers Record of Land Division. The bearings in this description were derived from the survey of the aforesaid 136.50 Acre Tract (N 81°46'00" E on the center of State Route 350).

Subject to all real property taxes and assessments now a lien upon said premises, the payment of which shall be prorated by the parties as of the date hereof.

Prior Instrument Reference: Volume 19, at Page 110, Official Records, Clinton County, Ohio.

## EXHIBIT B

## MEMORANDUM OF PURCHASE OPTION AND
## PURCHASE AND SALE AGREEMENT

*[Form follows this page]*

confidential
John Lichtenberger
coresolar.energy
Sep 15, 2020 19:06

**RECORDING REQUESTED BY AND**
**WHEN RECORDED, MAIL TO:**

Clinton Solar LLC
1201 Louisiana Street, Suite 3200
Houston, Texas 77002
Attention:  Land Department

**PREPARED BY:**

Terrence N. O'Donnell
Dickinson Wright PLLC
150 E. Gay Street, Suite 2400
Columbus, Ohio 43215
Phone:  (614) 744-2583

---

## MEMORANDUM OF PURCHASE OPTION AND
## PURCHASE AND SALE AGREEMENT

This **MEMORANDUM OF PURCHASE OPTION AND PURCHASE AND SALE AGREEMENT** (this "***Memorandum***") is made as of _____, 20__, by and between **Robert E. Stoll, II, a single man** ("***Seller***"), whose mailing address is 1909 E Sr 22-3, Morrow, OH 45152, and **CLINTON SOLAR LLC**, a Delaware limited liability company ("***Purchaser***"), whose mailing address is 1088 Sansome Street, San Francisco, California 94111, to serve as notice to all parties and persons that Seller and Purchaser have entered into a Purchase Option and Purchase and Sale Agreement (the "***Agreement***"), with an effective date of _____, 20___ (the "***Effective Date***").  Seller and Purchaser (and their respective successors and assigns under the Agreement) are sometimes hereinafter referred to collectively as the "***Parties***".

Seller claims title to that certain real property situated in Clinton County, Ohio, and legally described on **Exhibit A** attached hereto and made a part hereof (the "***Land***"), pursuant to that certain instrument dated November 19, 1998, and recorded on December 2, 1998, in Volume 285, Page 85, in the Clinton County, Ohio, real property records (the "***Real Property Records***").

For and in consideration of the mutual covenants and promises contained in the Agreement and other good and valuable consideration, the Parties hereby agree that under and pursuant to the Agreement:

1.      Seller granted to Purchaser the irrevocable, sole and exclusive right and option to purchase (the "***Option***") all or any portion(s) of the Land, together with any and all of Seller's rights, title and interests in and to (i) buildings, structures, fixtures and other improvements located on the Land as of any Closing (as defined below) and (ii) other appurtenances and interests pertaining to or benefiting the Land, including, without limitation, any and all development rights, entitlements, water rights, mineral rights, claims, strips and gores, easements, leases, licenses, permits and other rights in and to adjoining roadways and rights-of-way (the Land and such other property are referred to herein collectively as the "***Property***").  Seller granted to Purchaser the sole and exclusive right, during the Option Term (as defined below) to evaluate, examine, inspect, investigate, assess, research, test, study, record, measure and monitor the Property and all resources,

of whatever kind and nature, located on, about, above, over, through, across, within and at the Land and as additionally provided in the Agreement. In connection with such activities and Purchaser's other rights under the Agreement, Seller granted to Purchaser a non-exclusive, right-of-entry license upon, over, through and across the Land. Such license shall automatically terminate upon the expiration or termination of the Option and the Agreement.

2. If the Land is located within a portion of real property owned by Seller and there is no reasonable access to and from the Land and a public right-of-way, Seller granted to Purchaser a non-exclusive, temporary access easement for the purposes of ingress, egress and regress to and from the Land and a public right-of-way, which easement shall be on, over, through, across and within Seller's real property located adjacent to the Land, in a location mutually and reasonably determined by Seller and Purchaser. The temporary access easement shall automatically terminate upon the expiration or termination of the Option and the Agreement; provided, however, upon any Closing, the Parties shall enter into an access easement agreement, mutually acceptable to both Parties, under which Seller shall grant to Purchaser a permanent, exclusive access easement to and from the Land and a public right-of-way.

3. The Option shall have a term of up to three (3) years from the Effective Date (the "***Option Term***"), and the Agreement may be further extended by a closing period of at least one hundred eighty (180) days following Purchaser's exercise (if any) of the Option.

4. From the Effective Date through any closing of the sale and purchase of the Property to Purchaser (the "***Closing***"), the right to purchase and/or acquire the Property and any and all rights, title and interests of Seller in and to the Property shall be exclusive to Purchaser, and Seller shall not sell, convey, dispose of, exchange, contribute, gift or otherwise transfer, or in any way further or newly encumber (whether by lien, lease, easement, license or otherwise, including any renewals or extensions thereof), all or any part of (i) the Property, (ii) Seller's oil, gas or other mineral interests therein (if any) or (iii) any of Seller's other rights, title or interests in and to same.

5. If Closing does not occur, then the Option, the Agreement and this Memorandum shall automatically terminate, and the Property shall be deemed released therefrom. If Closing occurs, the Option, the Agreement and this Memorandum shall automatically terminate as of the date of the warranty deed from Seller to Purchaser conveying the Property, and the Property shall be deemed released from the Option, the Agreement and this Memorandum as of such date of conveyance.

6. The Option, the Agreement and this Memorandum shall constitute real rights and covenants touching, concerning and running with and burdening the Property and shall be binding upon all persons and parties claiming any interest in the Property or any portion thereof, including, without limitation, each Party's successors and assigns and, if applicable, any such Party's heirs, executors, administrators and personal representatives.

7. This Memorandum is intended to provide notice to third parties of the Agreement and certain provisions contained therein. Nothing in this Memorandum amends, modifies or otherwise affects or controls over (nor shall anything herein be interpreted or deemed to amend, modify or otherwise affect or control over) the terms, conditions, restrictions and/or provisions contained in the Agreement, and in the event of any conflicts between the contents of said instruments, the contents of the Agreement shall control over the contents of this Memorandum.

8.      The Agreement and this Memorandum shall be governed by the laws of the State in which the Land is situated, without regard to any conflicts of law principles to the contrary.

9.      This Memorandum may be executed in separate and multiple counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

*[Signature pages and Exhibit follow this page]*

confidential
John Lichtenberger
coresolar.energy
Sep 15, 2020 19:06

IN WITNESS WHEREOF, the Parties hereto have caused this Memorandum to be duly executed by their respective authorized representatives.

**SELLER:**

Signature: _____

Printed Name: Robert E. Stoll, II

**State of Ohio Statutory Short Form of Acknowledgment**

STATE OF _____

COUNTY OF _____

The foregoing instrument was acknowledged before me this ___ day of _____, 20__, by Robert E. Stoll, II, a single man.

(NOTARY SEAL)

Signature: _____

Printed Name: _____

Notary Public in and for the State of _____

My Commission Expires: _____

**PURCHASER:**

**CLINTON SOLAR LLC**

By: _____

Name: _____

Title: _____

STATE OF TEXAS

COUNTY OF HARRIS

The foregoing instrument was acknowledged before me this ___ day of _____, 20__, by _____, as _____ of **CLINTON SOLAR LLC**, a Delaware limited liability company, on behalf of the limited liability company.

(NOTARY SEAL)

Signature: _____

Printed Name: _____

Notary Public in and for the State of Texas

My Commission Expires: _____

### Exhibit A to the Memorandum of Purchase Option and Purchase and Sale Agreement

#### Description of the Land

Approximately **44.279** acres of land, more or less, situated in the Township of Clark, County of Clinton and State of Ohio, being Clinton County Tax Map Parcel Number 070030702000000 and being more particularly described by that certain deed dated November 19, 1998 from Paul Allen Kelly and Joyce A. Kelly to Robert E. Stoll, II, recorded at Instrument Number 1998-00009703 on December 2, 1998 in the Office of the Recorder of Deeds of the aforementioned County and State and being more fully described as follows:

Situate in Clark Township, Clinton County, Ohio and being a part of Military Survey No. 1939 and bounded and described as follows:

Beginning at a nail (found) in the center of State Route 350 at the Northeasterly corner of a 9.678 Acre Tract as recorded in Volume 28, Plat No. 127, of the Clinton County Engineers Record of Land Division: Running thence, from said point of beginning, with the lines of a 136.50 Acre Tract as recorded in Volume 9, Page 423, of the Clinton County Surveyors Record in State Route 350, on the following courses: (1) N 74°20'43" E 402.81 feet to a nail (found); (2) N 81°46'00" E 345.30 feet to a nail (set); thence, by a new division line, S 3°15'26" E (passing a 5/8" iron pin (set) at 30.00 feet) a distance of 2147.01 feet to a 5/8" iron pin (set); thence, with the lines of the aforesaid 136.50 Acre Tract, on the following courses: (1) N 87°47'09" W 1186.54 feet to a 5/8" iron pin (set); (2) N 2°51'42" W (passing a 5/8" iron pin (set) at 308.82 feet) a distance of 353.82 feet to a point; thence with the lines of the aforesaid 9.678 Acre Tract in a stream, on the following courses: (1)  N 33°21'36" E 524.32 feet to a point (witness a 5/8" iron pin (set) bears N 88°50'00" E 35.00 feet); (2) N 2°38'11" W 796.10 feet to a point (witness a 5/8" iron pin (set) bears N 78°47'00" E 28.00 feet); (3) N 15°49'06" E 366.89 feet to the point of beginning, containing Forty Four and Two Hundred Seventy Nine Thousandths (44.279) Acres. Subject to all legal highways and easements of record.

This description is the result of a new survey made under the direction of Richard D. Roll, Registered Surveyor No. 4957, by CLINCO AND SUTTON SURVEYORS, Wilmington, Ohio, in October 1998, as recorded in Volume 29, Plat No. 197, of the Clinton County Engineers Record of Land Division. The bearings in this description were derived from the survey of the aforesaid 136.50 Acre Tract (N 81°46'00" E on the center of State Route 350).

Subject to all real property taxes and assessments now a lien upon said premises, the payment of which shall be prorated by the parties as of the date hereof.

Prior Instrument Reference: Volume 19, at Page 110, Official Records, Clinton County, Ohio.

## EXHIBIT C

### UNRECORDED AGREEMENTS AND OTHER
### INTERESTS IN THE PROPERTY

**None**

confidential
John Lichtenberger
coresolar.energy
Sep 15, 2020 19:06

**2021-00002527**

KIND: DEED
RECORDED: 04/29/2021 03:23:03 PM
FEE AMT: 34.00
CLINTON COUNTY, OHIO
TANYA K. DAY RECORDER

*Electronically Recorded*

**T R A N S F E R R E D**
This Conveyance has been examined
and the Grantor has complied with
Section 319.202 of the Revised Code.
FEE: $          EXEMPT: T
Terence G. Habermehl, Clinton Co. Auditor
Transfer Fee:$ 0.50  Date: 4/29/2021  By:CAG
Subject to Final Approval

# General Warranty Deed
### (Per O.R.C. 5302.05)

Robert E. Stoll II, single, of Warren County, Ohio, for valuable consideration paid, grants, with general warranty covenants, to RES Farms LLC, an Ohio Limited Liability Company, whose tax-mailing address is:

1909 E US 22-3
Morrow, Ohio 45152

**His entire interest in the following Real Property:** Situated in the Township of Clark, in the County of Clinton, in the State of Ohio and being more particularly bounded and described as follows in the attached Exhibit "1", herein incorporated by reference.

Subject however to all easements, covenants and restrictions of record.

Parcel No:                    070030702000000

Commonly Known As:       State Route 350, Martinsville, Ohio 45146

Prior Instrument Reference:   OR 285 Page 85 of the Official Records of Clinton County, Ohio

Signed and acknowledged this 21st day of April 2021.

*Robert E. Stoll II*
Robert E. Stoll II

State of Ohio                          )
                                       )ss.
County of Butler                       )

**BE IT REMEMBERED**, that on this 21st day of April 2021, before me, the subscriber, a notary public in and for said county, personally came Robert E. Stoll II, the Grantor in the foregoing Deed, and acknowledged the signing thereof to be his voluntary act and deed, for the purposes herein mentioned.

**IN TESTIMONY THEREOF,** I have hereunto subscribed my name and affixed my seal on this day and year aforesaid.

APPROVED FOR ACCURACY
Clinton County Engineers Map Dept.
Date: 4/29/2021 Survey Vol: 29 Page: 197
Per: vhall

## Exhibit "1"

### PARCEL NUMBER: 070030702000000

Situate in Clark Township, Clinton County, Ohio and being a part of Military Survey No. 1939 and bounded and described as follows: Beginning at a nail (found) in the center of State Route 350 at the Northeasterly corner of a 9.678 Aere Tract as recorded in Volume 28, Plat No. 127, of the Clinton County Engineers Record of Land Division: Running thence, from said point of beginning, with the lines of a 136.50 Acre Tract as recorded in Volume 9, Page 423, of the Clinton County Surveyors Record in State Route 350, on the following courses: (1) N 74° 20' 43" E 402.81 feet to a nail (found); (2) N 81° 46' 00" E 345.30 feet to a nail (set); thence, by a new division line, S 3° 15' 26" E (passing a 5/8" iron pin (set) at 30.00 feet) a distance of 2147.01 feet to a 5/8" iron pin (set); thence, with the lines of the aforesaid 136.50 Acre Tract, on the following courses: (1) N 87° 47' 09" W 1186.54 feet to a 5/8" iron pin (set); (2) N 2° 51' 42" W (passing a 5/8" iron pin (set) at 308.82 feet) a distance of 353.82 feet to a point; thence with the lines of the aforesaid 9.678 Acre Tract in a stream, on the following courses: (1) N 33° 21' 36" E 524.32 feet to a point (witness a 5/8" iron pin (set) bears N 88° 50' 00" E 35.00 feet); (2) N 2° 38' 11" W 796.10 feet to a point (witness a 5/8" iron pin (set) bears N 78° 47' 00" E 28.00 feet); (3) N 15° 49' 06" E 366.89 feet to the point of beginning, containing Forty Four and Two Hundred Seventy Nine Thousandths (44.279) Acres. Subject to all legal highways and easements of record.

This description is the result of a new survey made under the direction of Richard D. Roll, Registered Surveyor No. 4957, by CUNCO AND SUTTON SURVEYORS, Wilmington, Ohio, in October, 1998, as recorded in Volume 29 Plat No. 197 of the Clinton County Engineers Record of Land Division. The bearings in this description were derived from the survey of the aforesaid 136.50 Acre Tract (N 81° 46' 00" E on the center of State Route 350).

SUBJECT TO all real property taxes and assessments now a lien upon said premises, the payment of which shall be prorated by the parties as of thejdate hereof.

Commonly Known As: State Route 350, Martinsville, Ohio 45146

Prior Instrument Reference: OR 285 Page 85 of the Official Records of Clinton County, Ohio

## **REAL PROPERTY RIGHTS ASSIGNMENT AND ASSUMPTION AGREEMENT**

This REAL PROPERTY RIGHTS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of _____, 2022, but shall relate back to and effective as of the Effective Date, is entered into by and between **Robert E. Stoll, II**, a single person ("Assignor") and **RES Farms LLC**, an Ohio Limited Liability Company ("Assignee") , who tax-mailing address is:  1909 E US 22-3, Morrow, Ohio 45152.

WHEREAS, the Assignor is a party to that certain Purchase Option and Purchase and Sale Agreement, dated July 15, 2020, by and between Robert E. Stoll, II, a single man ("Seller") and Clinton Solar, LLC, a Delaware limited liability company ("Purchaser") which Assignor claims title to that certain real property situated in Clinton County, Ohio and legally described on Exhibit A attached hereto and made a part hereof (the "Land"), and further evidenced by that certain Memorandum of Purchase Option and Purchase and Sale Agreement, dated July 2, 2020 and recorded on November 12, 2020, as Instrument 2020-00005879, in the Official Records of Clinton County, Ohio (collectively the "Purchase Agreement").

WHEREAS, the Assignor, through a related party transaction, conveyed all of its right, title and interest in said Land described above to Assignee pursuant to that certain General Warranty Deed dated April 21, 2021 ("Effective Date") , and recorded on April 29, 2021, as Instrument No. 2021-00002527, in the Official Records of Clinton County, Ohio.

NOW THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor and Assignee agree as follows:

1. The Assignor hereby transfers, assigns, conveys, and delivers to Assignee all of Assignor's rights, title, and interest in and to the Purchase Agreement with Purchaser.

2. Assignee accepts and acquires all of the Assignor's right, title, and interest in and to the Purchase Agreement and hereby assumes all liabilities, duties, obligations, commitments, and responsibilities of the Assignor arising under the Purchase Agreement from and after the Effective Date.

3. This Agreement is in accordance with and subject to all of the representations, warranties, covenants, agreements, indemnities, and survival periods set forth in the Purchase Agreement.  Each of the Parties hereto acknowledges and agrees that the representations, warranties, covenants, agreements, indemnities, and survival periods contained in the Purchase Agreement are not superseded hereby but remain in full force and effect to the full extent

provided herein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.  The construction and performance of this Agreement shall be governed by the laws of the State of Ohio without regard to its principles of conflicts of law.

5.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, which is binding upon the parties, nothwithstanding that such parties are not signatories to the same counterpart.  The exchange of executed copies of this Agreement by facsimile transmission, or as an attachment to an electronic mail message in "pdf" or similar format, will constitute effective execution and delivery and may be used in lieu of the original document for all purposes.

6.  This Agreement shall be binding upon and inure to the benefit of the Assignee and the Purchaser and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed, delivered, and effective as of the Effective Date.

**<u>ASSIGNOR:</u>**

By:_____
Name:  Robert E. Stoll, II

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2022 by Robert E. Stoll, II, who is personally known to me or has produced identification.

_____

(NOTARY SEAL)                                    Notary Public
Print Name: _____

**<u>ASSIGNEE:</u>**

**RES Farms LLC**


By:_____

Name:  Robert E. Stoll, II

Title: _____


STATE OF _____

COUNTY OF _____


      The foregoing instrument was acknowledged before me this _____ day of _____, 2022 by Robert E. Stoll, II, as _____ of RES Farms LLC, who is personally known to me or has produced identification.


                                          _____

(NOTARY SEAL)                   Notary Public

                                          Print Name: _____

**PURCHASER:**

**Clinton Solar, LLC**
**By:  Core Solar Development, LLC**
Its Sole Member


By:_____
Name: Greg Nelson
Title:   President

STATE OF _____
COUNTY OF _____


    The foregoing instrument was acknowledged before me this _____ day of _____, 2022 by Greg Nelson, as President of Core Solar Development, LLC, who is personally known to me or has produced identification.



_____
(NOTARY SEAL)                Notary Public
                           Print Name: _____




[Exhibit follow this page]

**EXHIBIT A**

**His entire interest in the following real property:** Situated in the Township of Clark, in the County of Clinton, in the State of Ohio and being more particularly bounded and described as follows:

Parcel No.:                      070030702000000
Commonly Known As:      State Route 350, Martinsville, Ohio  45146
Prior Instrument Reference:  OR 285, Page 85 of the Official Records of Clinton County, Ohio

Approximately **44.279 acres** of land, more or less, situated in the Township of Clark, County of Clinton and State of Ohio, being Clinton County Tax Map Parcel Number 070030702000000 and being more particularly described by that certain deed dated November 19, 1998, from Paul Allen Kelly and Joyce A. Kelly to Robert E. Stoll, II, recorded at Instrument Number 1998-00009703 on December 2, 1998 in the Office of the Recorder of Deeds of the aforementioned County and State and being more fully described as follows:

Situated in Clark Township, Clinton County, Ohio and being a part of Military Survey No. 1939 and bounded and described as follows:

Beginning at a nail (found) in the center of State Route 350 at the Northeasterly corner of a 9.678 Acre Tract as recorded  in Volume 28, Plat No. 127, of the Clinton County Engineers Record of Land Division: Running thence, from said point of beginning, with the lines of a 136.50 Acre Tract as recorded in Volume 9, Page 423, of the Clinton County Surveyors Record in State Route 350, on the following courses:
(1) N 74°20'43" E 402.81 feet to a nail (found);
(2) N 81°46'00" E 345.30 feet to a nail (set); thence, by a new division line, S 3°15'26" E (passing a 5/8" iron pin (set) at 30.00 feet) a distance of 2147.01 feet to a 5/8" iron pin (set); thence, with the lines of the aforesaid 136.50 Acre Tract, on the following courses: (1) N 87°47'09" W 1186.54 feet to a 5/8" iron pin (set); (2) N 2°51'42" W (passing a 5/8" iron pin (set) at 308.82 feet) a distance of 353.82 feet to a point; thence with the lines of the aforesaid 9.678 Acre Tract in a stream, on the following courses: (1)  N 33°21'36" E 524.32 feet to a point (witness a 5/8' iron pin (set) bears N 88°50'00" E 35.00 feet); (2) N 2°38'11" W 796.10 feet to a point (witness a 5/8" iron pin (set) bears N 78°47'00" E 28.00 feet (3) N 15°49'06" E 366.89 feet to the point of beginning, containing Forty Four and Two Hundred Seventy Nine Thousandths (44.279) Acres. Subject to all legal highways and easements of record.

This description is the result of a new survey made under the direction of Richard D. Roll, Registered Surveyor No. 4957, by CLINCO AND SUTTON SURVEYORS, Wilmington, Ohio, in October 1998, as recorded in Volume 29, Pat No. 197, of the Clinton County Engineers Record

of Land Division. The bearings in this description were derived from the survey of the aforesaid 136.50 Acres Tract (N 81º46'00" E on the center of State Route 350).



September 23, 2022

Via FedEx tracking No. 7700 - 2155 - 1903

RES Farms, LLC
Mr. Robert E. Stoll, III
1909 E US 22-3
Morrow, Ohio 45152

Re:     Option Exercise Notice ("Notice") - Clinton Solar, LLC Project ( 44.279 acres)

Dear Mr. Stoll:

I am writing in reference to the Purchase Option and Purchase and Sale Agreement ("Agreement") dated July 15, 2020 between RES Farms, LLC (as "Seller") and Robert E. Stoll, III (as "Original Seller") both collectively as "Seller" and Clinton Solar LLC (as "Purchaser"), as evidenced by that Memorandum of Purchase Option and Purchase and Sale Agreement dated July 2, 2020, between Seller and Purchaser, and recorded on November 12, 2020, Document No. 2020-00005879 in Clinton County, Ohio.

This letter shall serve as Purchaser's notice to you that Purchaser has elected to exercise its option to purchase effective as of September 29, 2022 pursuant to Paragraph 2.2(a) of said Agreement.

Per Section 5.2 (Closing), the anticipated Closing Period will be approximately one-hundred eighty (180) days from effective date of this Notice, which will be on or before March 31, 2023.

Should you have any questions, please feel free to contact our Director of Eastern Development and Project Economics, Kyle Corcoran at (704) 808-9451.

Sincerely,

Greg Nelson
Chief Development Officer

Enclosures



180 E. BROAD STREET, SUITE 3400
COLUMBUS, OH 43215-3707
TELEPHONE: 614-744-2570
FACSIMILE: 844-670-6009
http://www.dickinsonwright.com

MICHAEL D. BRIDGES
MBridges@dickinsonwright.com
614-744-2577

March 2, 2023

VIA FEDERAL EXPRESS
Mr. Robert E. Stoll, II
RES Farms, LLC
1909 E US 22-3
Morrow, Ohio 45152

Re:   Clinton Solar, LLC Acquisition of 44.279 acres located in Clinton County, Ohio (the "Property") from RES Farms, LLC

Dear Mr. Stoll, III:

We are legal counsel to Clinton Solar, LLC, a Delaware limited liability company ("Clinton Solar") and will be assisting in our client's acquisition of the Property more particularly described in that certain Purchase Option and Purchase and Sale Agreement dated July 15, 2020 between Robert E. Stoll, II and Clinton Solar ("Agreement"). We are aware that you have conveyed the subject real property to your limited liability company. Under Section 16.9 of the Agreement, the Agreement is binding on you and RES Farms, LLC.

On September 23, 2022, Clinton Solar provided its written notice ("Option Notice") that it has elected to exercise its option to purchase the Property consistent with the terms of the Agreement and close the acquisition on or before March 31, 2023. Enclosed you will find the following documents for execution and completion required to close the acquisition of the Property ("Seller Closing Documents"):

1. General Warranty – Please sign and have notarized;
2. Affidavit and Indemnity as to Debts, Liens, and Possession – Please sign and have notarized;
3. Foreign Investment Real Property Tax Act Affidavit – Please complete items 3 and 4, sign, and have notarized;
4. Closing Statement- Please sign;
5. Seller Certification Form 1099 Reporting – Please complete Items 2, 3, complete your permanent address, and sign;
6. Statement of Conveyance of Current Agricultural Use Valuation Property – Please sign and have notarized;
7. W-9 Request for Taxpayer Identification Number and Certification – Please complete Items 2-6 and insert either the Employer Identification Number for RES Farms, LLC or, if RES Farms, LLC does not have an Employer Identification Number, your Social Security Number in Part I of the form; and
8. Stewart Title Guaranty Company Form in the event that you want proceeds of the sale to be wired into an account selected by you.

ARIZONA   CALIFORNIA   FLORIDA   ILLINOIS   KENTUCKY   MICHIGAN   NEVADA   OHIO   TENNESSEE   TEXAS   WASHINGTON DC   TORONTO

DICKINSON WRIGHT PLLC

Mr. Robert E. Stoll, II
March 2, 2023
Page 2

  Given that you have conveyed the Property to RES Farms, LLC, Stewart Title Guaranty Company ("Title Company") will be requesting organizational information such as the Articles of Organization, Operating Agreement, and evidence of your authority to sign on behalf of RES Farms, LLC.  Additionally, the Title Company will need to contact you for additional information such as where you want the proceeds of the sale to be delivered.  Originals of the Seller Closing Documents and all other documents requested by the Title Company should be delivered to the Title Company prior to March 31, 2023. The point of contact at the Title Company is:

Trevor Smith, Escrow Officer
Stewart Title Guaranty Company
1360 Post Oak Blvd., 10th Floor
Houston, TX 77056
Phone: 713-598-7304
Email: Trevor.Smith@Stewart.com

We have enclosed an addressed Federal Express envolope for your delivery of the Seller Closing Documents.

  Our client stands ready to complete all of its obligations under the Agreement.  It is our understanding that you have had conversations in the community that you will not cooperate in the sale of the Property.  This amounts to an anticipatory repudiation of the Agreement by you.

  Under the terms of the Agreement, you have agreed to convey the Property to our client. Pursuant to Section 7.4, you have agreed not to interfere or hinder the exercise of our client's rights under the Agreement. It is our client's expectation that you will cooperate and fulfill all of your contractual obligations under the Agreement.  Should you not fulfill your obligations under the Agreement; our client will be forced to pursue all available remedies at law and/or in equity.

  If you do not intend to cooperate and fulfill all your obligations under the Agreement, please notify me no later than ten (10) days from the date of this letter.

  If you need assistance in arranging for the notarization, please let us know.

        Sincerely,

        Michael D. Bridges

Enclosure
cc: Clinton Solar Energy and Stewart Title
4877-4836-9746 v1 [104629-2]

ARIZONA CALIFORNIA FLORIDA ILLINOIS KENTUCKY MICHIGAN NEVADA OHIO TENNESSEE TEXAS WASHINGTON DC TORONTO

# INSTRUCTIONS FOR EXECUTION AND NOTARIZATION

## OWNER INSTRUCTIONS

**\*\*NOTE - IF YOU WILL NOT BE EXECUTING YOUR DOCUMENTS IN THE UNITED STATES PLEASE NOTIFY STEWART TITLE GUARANTY IMMEDIATELY SO THAT WE MAY PROVIDE PROPER EXECUTION INSTRUCTIONS. \*\***

- Carefully review each document and complete as indicated. <u>If a question does not apply to you, please write N/A in the blank.</u>

- Please sign your name **<u>EXACTLY</u>** as it appears on each of the documents. If names are misspelled please correct and initial or contact this office for further instructions.

- IF THESE DOCUMENTS ARE NOT EXECUTED CORRECTLY, A NEW SET WILL HAVE TO BE COMPLETED. THIS COULD RESULT IN DELAYED RECEIPT OF YOUR PROCEEDS.

- **Please print on single sided letter size paper and sign in BLUE INK**

## NOTARY INSTRUCTIONS

- Notary's name must be typed or printed under signature.
- Notary seal must be affixed to all documents which have been notarized.
- ***Notary expiration date and ID Number must be typed or printed on all documents which have been notarized.***
- Notary to insert the State and County (or Parrish) in which papers are being signed.
- DO NOT change the execution date shown on papers. This date does not affect the date of notarization.
- Notary is to fill in the date of notarization form only on acknowledgement

**NOTARY: Please fill out with your information and return with instruments you have acknowledged.**

- Name: _____

- Address: _____

- Phone Number: _____

- Expiration Date: _____ ID Number: _____

**\*\*\*NOTE: Please provide us with a copy of the Driver's License of:**

**\*\*\*Signer(s):  All Individuals signing closing docs**

## GENERAL WARRANTY DEED

KNOW ALL MEN BY THESE PRESENTS, that **RES FARMS, LLC** ("Grantor") for valuable consideration paid, hereby grants and conveys with general warranty covenants to **CLINTON SOLAR LLC,** a Delaware limited liability company whose tax mailing address is 4330 Gaines Ramch Loop, Suite 100, Austin, Texas 78735, Attention: Tax Department the following real property:

Situated in the State of Ohio, County of Clinton and Township of Clark

**See Exhibit A**

Parcel No. 07003070200000

Property Address: State Route 350, Martinsville, Ohio 45146

Prior instrument reference: Instrument No. 2021-00002527

This conveyance is made subject to all zoning and building codes, matters that would be disclosed on an accurate survey, all liens, restrictions, conditions, reservations and easements of record, and the lien for real estate taxes not yet due and payable

<u>SIGNATURE ON NEXT PAGE</u>

1

Grantor has executed this Deed effective the ___ day of _____, 2023.

RES FARMS LLC, an Ohio limited liability company

By:_____
Print Name: Robert E. Stoll, II
Its: Member

STATE OF OHIO
COUNTY OF _____

The foregoing instrument was acknowledged before me the _____ day of _____, 2023 by Robert E. Stoll, the member of RES FARMS LLC, an Ohio limited liability company on behalf os said limited liabilit company. The notarial act certified hereby is an acknowledgement. No oath or affirmation was administered to the signer with regard to the notarial act certified to hereby. IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my official seat on the day and year aforesaid.

[Affix Notary Seal]

_____
Notary Public

This instrument was prepared by:
Michael D. Bridges, Esq.
Dickinson Wright PLLC
150 E. Gay St., Suite 2400
Columbus, Ohio 43215
Telephone: 614-744-2577

2

EXHIBIT A

LEGAL DESCRIPTION

EXHIBIT "A"

Situate in Clark Township, Clinton County, Ohio and being a part of Military Survey No. 1939 and bounded and described as follows: Beginning at a nail (found) in the center of State Route 350 at the Northeasterly corner of a 9.678 Acre Tract as recorded in Volume 28, Plat No. 127, of the Clinton County Engineers Record of Land Division: Running thence, from said point of beginning, with the lines of a 136.50 Acre Tract as recorded in Volume 9, Page 423, of the Clinton County Surveyors Record in State Route 350, on the following courses: (1) N 74° 20' 43' E 402.81 feet to a nail (found); (2) N 81° 46' 00 E 345.30 feet to a nail (set); thence, by a new division line, S 3° 15' 26' E (passing a 5/8" iron pin (set) at 30.00 feet) a distance of 2147.01 feet to a 5/8" iron pin (set); thence, with the lines of the aforesaid 136.50 Acre Tract, on the following courses: (1) N 87° 47' 09" W 1186.54 feet to a 5/8" iron pin (set); (2) N 2° 51' 42" W (passing a 5/8" iron pin (set) at 308.82 feet) a distance of 353.82 feet to a point; thence with the lines of the aforesaid 9.678 Acre Tract in a stream, on the following courses: (1) N 33° 21' 36" E 524.32 feet to a point (witness a 5/8" iron pin (set) bears N 88° 50' 00" E 35.00 feet); (2) N 2° 38' 11" W 796.10 feet to a point (witness a 5/8" iron pin (set) bears N 78° 47' 00" E 28.00 feet); (3) N 15° 49' 06" E 366.89 feet to the point of beginning, containing Forty Four and Two Hundred Seventy Nine Thousandths (44.279) Acres. Subject to all legal highways and easements of record.

This description is the result of a new survey made under the direction of Richard D. Roll, Registered Surveyor No. 4957, by CLINCO AND SUTTON SURVEYORS, Wilmington, Ohio in October, 1998, as recorded in Volume 29, Plat No. 197, of the Clinton County Engineers Record of Land Division. The bearings in this description were derived from the survey of the aforesaid 136.50 Acre Tract (N 81°46'00" E on the center of State Route 350).

Prior Instrument Reference: Volume 19, at Page 110, Official Records, Clinton County, Ohio.

Parcel No.: 07003070200000

4869-2985-1411 v1 [100942-1]

3

## AFFIDAVITS AND INDEMNITY AS TO DEBTS, LIENS, AND POSSESSION
### (USE SEPARATE FORM FOR EACH PARTY)
### (TO BE FILLED IN PERSONALLY BY SELLER OR BORROWER
### IN HIS/HER OWN HANDWRITING)

File Number:    17000333420-06
Subject Property: 0 SR 350, Martinsville, OH 45146

State: _____    )

County:    ) BEFORE ME, the undersigned authority, on this day personally appeared:

RES Farms LLC, an Ohio limited liability company
_____
Seller or Owner Borrower*

_____
Contractor (if new construction)

personally known to me to be the person whose name is subscribed hereto and upon his/her oath deposes and says that no proceedings in bankruptcy or receivership have been instituted by or against him/her and that the marital status of Affiant has not changed since the day of acquisition of said property and represents to the purchaser and/or Lender in this transaction that there are:

1.  No unpaid debts for lighting and plumbing fixtures, water heaters, floor furnaces, heaters, air conditioners, built-in fireplace screens, installed outdoor cooling equipment, swimming pool equipment, built-in cleaning equipment, built-in kitchen equipment, satellite dish, radio or television antennae, garage door openers, carpeting, rugs, lawn sprinkling systems, venetian blinds, curtains and rods, window shades, draperies and rods, valances, screens, shutters, awnings, mirrors, ceiling fans, attic fans, mail boxes, security and fire alarm detection equipment, water softener, electric appliances, fences, street paving, or any personal property or fixtures that are located on the subject property described above, and that no such items have been purchased on time payment contracts, and there are no security interests on such property secured by financing statement, security agreement or otherwise except the following:

| Creditor | Approximate Amount |
|---|---|
|  |  |

(If NONE, write "NONE" on blank line)

2.  No loans, unpaid judgments, or liens (including Federal or State Liens or Judgment Liens) and no unpaid governmental or association taxes, charges or assessments of any kind on such property except the following:

| Creditor | Approximate Amount |
|---|---|
|  |  |

(If NONE, write "NONE" on blank line)

3.  All labor and materials used in the construction of improvements on the above-described property have been paid for and there are now no unpaid labor or material claims against the improvements or the property upon which same are situated, and I hereby declare that all sums of money due for the construction of improvements have been fully paid and satisfied, except the following:

_____
(If NONE, write "NONE" on blank line)

4.  No leases, contracts to sell the land, or parties in possession other than Affiant except as follows:

_____
(If NONE, write NONE on blank line)

*5.  To be filled in if a sale - "The Seller is not a non-resident alien, foreign corporation, foreign trust, foreign estate or other foreign entity (as defined in the Internal Revenue Code and Income Tax Regulations). Seller's U.S. employer identification number (or Social Security Number) is:_____  Seller's Address (office address, if Seller is an entity, home address if Seller is an individual) is:
_____

This Affidavit may be disclosed to the Internal Revenue Service and is furnished to Buyer to inform Buyer that withholding of tax is not required under Section 1445 of the Internal Revenue Code.

Indemnity:  I agree to pay on demand to the purchasers and/or lender and/or title companies (including Stewart Title Guaranty Company) in this transaction, their successors and assigns, all amounts secured by any and all liens, claims or rights not shown above, together with all costs, loss and attorney's fees that said parties may incur in connection with such unmentioned liens, provided said liens, claims, or rights either currently apply to such property, or a part thereof, or are subsequently established against said property and are created by me, known by me, or have an inception or attachment date prior to the closing of this transaction and recording of the deed and deed of trust/mortgage.

I realize that the Purchaser and Lender and title companies in this transaction are relying on the representations contained herein in purchasing same or lending money thereon and issuing title policies and would not purchase same or lend money or issue a title policy thereon unless said representations were made.  If Seller or Borrower is an entity, I have authority to sign on its behalf.

Dated this _____ day of _____, _____

RES Farms, LLC
an Ohio limited liability comapny


By:_____

Print Name: Robert E. Stoll, II
Its: Member


Sworn to and subscribed before me this the _____ day of _____, _____.

_____
Notary Public in and for the State of _____
My Commission expires: _____

**SIGN & DATE**

**NOTARIZE**

* **NOTE**:  This form is to be filled in by Seller in case of a sale.  If no sale, it is to be filled in and signed by the Owner-Borrower.  If there is any new construction, the contractor must also join in this form or fill in and sign a separate one.

** **If Seller is a non-resident alien, foreign corporation, etc., call your manager or underwriting personnel  (800) 729-1900.**

**NOTE TO BUYER:** Buyer must retain until end of fifth taxable year of transfer and must file with the Internal Revenue Service if required by regulation or otherwise.

# FOREIGN INVESTMENT REAL PROPERTY TAX ACT
# AFFIDAVIT

_____

Property Address: 0 SR 350, Martinsville, OH 45146
Escrow Number:   17000333420-06
Legal Description:

Section 1445 of the Internal Revenue Code [26 USCS § 1445] provides that a transferee (Buyer) of a U.S. real property interest must withhold tax if transferor (Seller) is a foreign person. For U.S. tax purposes (including section 1445 [26 USCS § 1445]), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by RES Farms LLC, an Ohio limited liability company (hereinafter, the "Transferor"), the undersigned hereby certifies the following on behalf of the Transferor:

1. That transferor (Seller): RES Farms LLC, an Ohio limited liability company
   Is not a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations):

2. The transferor is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii);

3. That transferor's (Seller) tax payer identification number or social security number is:
   _____

4. That transferor's address is:
   _____

   _____

Transferor understands that this certification may be disclosed to the Internal Revenue Service by various parties to the closing, including, but not limited to the transferor's attorney, transferor, brokerage agents, and the title company, their successors or assigns, and that any false statement contained herein could be punishable by fine, imprisonment or both.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS CERTIFICATION AND TO THE BEST OF MY KNOWLEDGE AND BELIEF IT IS TRUE, CORRECT AND COMPLETE, AND I FURTHER DECLARE THAT I HAVE AUTHORITY TO SIGN THIS DOCUMENT ON BEHALF OF THE TRANSFEROR.


RES Farms, LLC
an Ohio limited liability comapny


By:_____
Print Name: Robert E. Stoll, II
Its: Member



State of _____
County of _____

The foregoing instrument was acknowledged this the _____ day of _____, _____ by
Robert E. Stoll, the member of RES FARMS LLC, an Ohio limited liability company on behalf of said
limited liability company.

Witness my hand and official seal.

_____
Notary Public: _____
My commission expires: _____

File 17000333420-06      **Stewart Title Guaranty Company**      3/1/2023 2:41 PM
**Combined Statement**

Stewart Title Guaranty Company, Houston Energy
1360 Post Oak Blvd., 10th Floor, MC #10-1, Houston, TX 77056, (800) 729-1900
Escrow Officer: Jonathan Skalka

| | |
|---|---|
| **Seller(s)** | RES Farms LLC |
| **Buyer(s)** | Clinton Solar, LLC |
| **Lender(s)** | |
| **Property** | Property Address |
| | 0 SR 350 Martinsville, Ohio 45146 |
| | |
| | PIN |
| | 07003070200000 |

| Closing Date | 3/31/2023 | | Disbursement Date | 3/31/2023 | Proration Date | 3/31/2023 |
|---|---|---|---|---|---|---|

| | Buyer | | | Seller | |
|---|---|---|---|---|---|
| **Debit** | **Credit** | | **Debit** | **Credit** |
| | | **Sales Price/Consideration** | | |
| $575,627.00 | | Contract sales price | | $575,627.00 |
| | | **Deposits** | | |
| | $10,000.00 | Option term payment (one time) 7/15/2020 | $10,000.00 | |
| | $1,549.77 | Option term payment (annual) 7/15/2020 | $1,549.77 | |
| | $1,549.77 | Option term payment (annual) 7/15/2021 | $1,549.77 | |
| | $1,549.77 | Option term payment (annual) 7/15/2022 | $1,549.77 | |
| | | **Prorations** | | |
| | $254.70 | 2022 County taxes $1,044.54 1/1/2023 to 3/31/2023 | $254.70 | |
| | | **Title Charges** | | |
| $2,000.00 | | Settlement or closing fee to Stewart Title Commercial Services - Houston Energy | | |
| $2,396.50 | | Owners Coverage $570,977.69 Owners Policy $2,382.75 to Stewart Title Guaranty Company | | |
| $599.13 | | ALTA 3.2-06 to Stewart Title Guaranty Company | | |
| $239.65 | | ALTA 8.2-06 to Stewart Title Guaranty Company | | |
| $150.00 | | ALTA 17-06 to Stewart Title Guaranty Company | | |
| $150.00 | | ALTA 25-06 to Stewart Title Guaranty Company | | |
| $500.00 | | ALTA 36.7-06 to Stewart Title Guaranty Company | | |
| $100.00 | | Commitment Fee to Stewart Title Guaranty Company | | |
| $1,298.25 | | Extended Coverage Surcharge to Stewart Title Guaranty Company | | |
| | | **Recording Fees/Transfer Charges** | | |
| $60.00 | | Recording and processing fees | | |
| | | County Deed Tax | $1,439.75 | |
| | | State Deed Tax | $575.70 | |
| **$583,120.53** | **$14,904.01** | **Subtotals** | **$16,919.46** | **$575,627.00** |
| | **$568,216.52** | **Balance due from Buyer** | | |
| | | **Balance due to Seller** | **$558,707.54** | |
| **$583,120.53** | **$583,120.53** | **Totals** | **$575,627.00** | **$575,627.00** |

File 17000333420-06　　　　　　**Stewart Title Guaranty Company**　　　　　3/1/2023 2:41 PM
　　　　　　　　　　　　　　　　　　　　　**Combined Statement**

Dated as of this _____ day of _____, _____

**Buyer(s):**

Clinton Solar, LLC
, a Delaware limited liability company

By:_____

Name:_____

Title:_____

**Seller(s):**

RES Farms, LLC
an Ohio limited liability comapny

By:_____
Print Name: Robert E. Stoll, II
Its: Member

Stewart Title Guaranty Company
a Texas Corporation　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　Date
By:_____
　　Jonathan Skalka
　　Commercial Services Specialist

## SELLER CERTIFICATION FOR 1099 REPORTING ON THE SALE OR EXCHANGE OF COMMERCIAL REAL PROPERTY

This form must be completed by the seller of a commercial property. The term "seller" includes each owner of the property that is sold or exchanged. Each seller must complete their own form. This information is necessary to determine whether the sale or exchange should be reported to the Internal Revenue Service on Form 1099-S.

Seller Name:     RES Farms LLC

### PART I - SELLER INFORMATION

**Provide the seller's Legal Name and Taxpayer Identification Number (TIN).** If the seller is an individual filing jointly, provide *only* the primary seller's Name and TIN. Executors/Trustees should not list their Name as the seller unless reporting the proceeds on their personal tax return. Disregarded entities should provide the business owner's Legal Name and TIN.

1.  Legal Individual Name: _____     SSN: _____
                                                                        (XXX-XX-XXXX)

                                        **OR**

2.  Legal Entity Name:     RES Farms LLC _____     TIN/EIN: _____
    (Not DBA or AKA)                                                       (XX-XXXXXXX)

    Type of Legal Entity     ☐ Corporation  ☐ Sub Corp  ☐ Partnership  ☐ Estate  ☐ Trust
                             ☐ Sole Owned or Disregarded LLC

    If an LLC, operates as: ☐ Corporation  ☐ Sub Corp  ☐ Other: _____

3.  Name for 1099-S, if different: _____

### PERMANENT POST CLOSING MAILING ADDRESS

Street _____

City/State/Zip    , _____

### PART II - TRANSACTION INFORMATION

Closing Date (MM/DD/YY): 3/31/2023     File Number: 17000333420-06     Contract Sales Price: $575,627.00

Description of Property:  0 SR 350, Martinsville, OH 45146 _____
                                              (Street Address or Brief Legal)

County, City and School Taxes paid in advance by seller, charged to buyer _____

If multiple Sellers, request is hereby made that you **allocate** the sales price amount among the sellers: _____

_____

Is this sale part of a 1031 Tax Deferred Exchange?  ☐ Yes   ☐ No

### PART III - FOREIGN PERSONS

If checked, transferor is a foreign person (nonresident alien, foreign partnership, foreign estate or foreign trust)  ☐

### Part IV - SELLER CERTIFICATION

Under penalties of perjury, I certify that the number shown on this form is my correct Taxpayer Identification Number. I also certify that the other information shown herein is correct.

RES Farms, LLC
an Ohio limited liability comapny

                                                Date

By:_____
Print Name: Robert E. Stoll, II
Its: Member

SETTLEMENT AGENT INFORMATION (to be completed by settlement agent)

| | | |
|---|---|---|
| Name: | Stewart Title Guaranty Company - Commercial Services | Phone:  (800) 729-1900 |
| Address: | 1360 Post Oak Blvd., 10th Floor | |
| | MC #10-1 | |
| | Houston, TX 77056 | |
| Tax ID: | 74-0924290 | |

***SUBSTITUTE FORM 1099 SELLER STATEMENT:*** *Upon completion of this form, if the transaction is deemed reportable the information contained herein will be furnished to the Internal Revenue Service.* **This form is being provided to you in lieu of a formal tax statement,** *and if you are required to file a return and the IRS determines that the transaction has not been reported, a negligence penalty or other sanction will be imposed upon you for failure to report accordingly. You are required by law to provide the Settlement Agent with your correct taxpayer identification number and if you fail to provide them with the correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law.*

DTE 102
Rev. 8/09

# Statement of Conveyance of Current
# Agricultural Use Valuation Property

## To be attached to conveyance fee forms DTE 100 and 100(EX).

Grantor's name  RES Farms LLC

Grantor's address  1909 E. US 22-3 Morrow, Ohio 45152

Grantee's name  Clinton Solar, LLC

Grantee's address  4330 Gaines Ranch Lopp, Suite 100, Austin, TX 78735

Taxing district  070                                        Parcel or account number  07003070200000

The grantor of the property referred to above states that the property has qualified for the current agricultural use valuation exemption under Ohio Revised Code section 5713.31 for the preceding or the current tax year. The grantee has been made aware prior to the closing that if the property does not continue to so qualify, either for the current or for the succeeding tax year, it will be subject to a recoupment charge equal to the tax savings as described in R.C. sections 5713.30 and 5713.34. Furthermore, the grantor and the grantee have considered and accounted for the total estimated amount of such recoupment, if any, to the satisfaction of both the grantee and the grantor.

_____
Signature of grantor or representative

Sworn to or affirmed in my presence,

This ____ day of _____ 20 _____ .

_____
Notary public

Endorsement by the County Auditor

Upon presentation of this instrument, the county auditor shall endorse it, forward it to the grantee or his representative, and provide a copy of the endorsed instrument to the grantor or his representative, evidencing delivery to the county auditor.

_____
County auditor

_____
Date

| Form **W-9**<br>(Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification**<br>▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | **Give Form to the**<br>**requester. Do not**<br>**send to the IRS.** |
|---|---|---|

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

RES Farms LLC

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ __

Note. Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

**6** City, state, and ZIP code

Requester's name and address (optional)

**7** List account number(s) here (optional)

*Print or type.*
*See Specific Instructions on page 3.*

---

**Part I**  **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, *see How to get a TIN, later.*

**Note.** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

or

**Employer identification number**

---

**Part II**  **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| **Sign Here** | Signature of U.S. person ▶ | Date ▶ |
|---|---|---|

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9.*

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting,* later, for further information.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien;

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

• An estate (other than a foreign estate); or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

In the cases below, the following person must give Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States.

• In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the entity;

• In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the trust; and

• In the case of a U.S. trust (other than a grantor trust), the U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.)

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person,, do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

**Example.** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester,

2. You do not certify your TIN when required (see the instructions for Part II for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5. You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. *See Exempt payee code,* later, and the separate Instructions for the Requester of Form W-9 for more information.

Also see *Special rules for partnerships,* earlier.

## What is FATCA Reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all United States account holders that are specified United States persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code,* later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you no longer are tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account; for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

Form W-9 (Rev. 10-2018)

**Page 3**

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

**a. Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

**NOTE: ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040/1040A/1040EZ you filed with your application.

**b. Sole proprietor or single-member LLC.** Enter your individual name as shown on your 1040/1040A/1040EZ on line 1. You may enter your business, trade or "doing business as" (DBA) name on line 2.

**c. Partnership, LLC that is not a single-member LLC, C corporation, or S Corporation.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

**d. Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on line 2.

**e. Disregarded entity.** For U.S. federal tax purposes, an entity that is disregarded as an entity separate from its owner is treated as a "disregarded entity." See Regulations section 301.7701-2(c)(2)(iii). Enter the owner's name on line 1. The name of the entity entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2, "Business name/disregarded entity name." If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

### Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, you may enter it on line 2.

### Line 3

Check the appropriate box on line 3 for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box on line 3.

| IF the entity/person on line 1 is a(n) . . . | THEN check the box for . . . |
|---|---|
| • Corporation | Corporation |
| • Individual<br>• Sole proprietorship, or<br>• Single-member limited liability company (LLC) owned by an individual and disregarded for U.S. federal tax purpose. | Individual/sole proprietor or single-member LLC |
| • LLC treated as a partnership for U.S. federal tax purposes,<br>• LLC that has filed Form 8832 or 2553 to be taxed as a corporation, or<br>• LLC that is disregarded as an entity separate from its owner but the owner is another LLC that is not disregarded for U.S. federal tax purposes. | Limited liability company and enter the appropriate tax classification. (P= Partnership; C= C corporation; or S= S corporation) |
| • Partnership | Partnership |
| • Trust/estate | Trust/estate |

### Line 4, Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space in line 4 any code(s) that may apply to you.

**Exempt payee code.**

• Generally, individuals (including sole proprietors) are not exempt from backup withholding.

• Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

• Corporations are not exempt from backup withholding for payments made in settlement of payment card or third party network transactions.

• Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space in line 4.

1 – An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2)

2 – The United States or any of its agencies or instrumentalities

3 – A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

4 – A foreign government or any of its political subdivisions, agencies, or instrumentalities

5 – A corporation

6 – A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or possession

7 – A futures commission merchant registered with the Commodity Futures Trading Commission

8 – A real estate investment trust

9 – An entity registered at all times during the tax year under the Investment Company Act of 1940

10 – A common trust fund operated by a bank under section 584(a)

11 – A financial institution

12 – A middleman known in the investment community as a nominee or custodian

13 – A trust exempt from tax under section 664 or described in section 4947

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 7 |
| Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 4 |
| Payments over $600 required to be reported and direct sales over $5,000 [1] | Generally, exempt payees 1 through 5 [2] |
| Payments made in settlement of payment card or third party network transactions | Exempt payees 1 through 4 |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) written or printed on the line for a FATCA exemption code.

A – An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37)

B – The United States or any of its agencies or instrumentalities

C – A state, the District of Columbia, a U.S. commonwealth or possession, or any of their political subdivisions or instrumentalities

D – A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472 - 1(c)(1)(i)

E – A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i)

F – A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state

G – A real estate investment trust

H – A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940

I – A common trust fund as defined in section 584(a)

J – A bank as defined in section 581

K – A broker

L – A trust exempt from tax under section 664 or described in section 4947(a)(1)

M – A tax exempt trust under a section 403(b) plan or section 457(g) plan.

**Note:** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

**Line 5**

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, write NEW at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

**Line 6**

Enter your city, state and ZIP code.

**Part I. Taxpayer Identification Number (TIN)**

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How to get a TIN* below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note:** See *What Name and Number To Give the Requester*, later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.SSA.gov.* You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/Businesses* and clicking on Employer Identification Number (EIN) under Starting a Business. Go to *www.irs.gov/Forms* to view, download, or print Form W-7 and/or Form SS-4. Or, you can go to *www.irs.gov/OrderForms* to place an order and have Form W-7 and/or SS-4 mailed to you within 10 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

**Part II. Certification**

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, or 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see *Exempt payee code*, earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

Form W-9 (Rev. 10-2018)

**1. Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

**2. Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

**3. Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

**4. Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

**5. Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account [1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor [2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee [1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner [1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner [3] |
| 7. Grantor trust filing under Optional Form 1099 Filing Method 1 (see Regulation section 1.671-4(b)(2)(i)(A)) | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity [4] |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |

| For this type of account: | Give name and EIN of: |
|---|---|
| 14. Account with the Department of Agricultural in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments. | The public entity |
| 15. Grantor trust filing under the Form 1041 Filing Method or the Optional Form 1099 Filing Method 2 (see Regulation section 1.671-4(b)(2)(i)(B)) | The trust |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or DBA name on the "Business name/disregarded entity" name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.) Also *see Special rules for partnerships*, earlier.

**\*Note:** The grantor also must provide a Form W-9 to trustee of trust.

**Note:** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identify Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity or credit report, contact the IRS Identity Theft Hotline at 1-800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Victims of identify theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identify theft.

Form W-9 (Rev. 10-2018)

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at *spam@uce.gov* or report them at *www.ftc.gov/complaint*. You can contact the FTC at *www.ftc.gov/idtheft* or 877-IDTHEFT (877-438-4338). If you have been the victim of identity theft, see *www.IdentityTheft.gov* and Pub. 5027.

Visit *www.irs.gov/IdentityTheft* to learn more about identify theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and possessions for use in administering their laws. The information also may be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payers must generally withhold a percentage of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to the payer. Certain penalties may also apply for providing false or fraudulent information.

**Stewart Title Guaranty Company - Commercial
Services
1360 Post Oak Blvd., 10th Floor
MC #10-1
Houston, TX 77056**

If you would like your proceeds wired, please complete the following information.  If you do not want your proceeds wired, a check will be overnighted to you the day of the closing.

In order to complete a wire transfer of your proceeds, we will need the following information:

Name of Bank:

_____

Address of Bank:

_____

_____

Bank Phone Number:   _____

Account Number:   _____

Routing Number:   _____

How your name appears on the account:

_____

_____

Beneficiary Address: _____

Thank you for the opportunity to close this transaction for you. We greatly appreciate your business.  Please feel free to contact us at any of the numbers above if you have any questions.

Thank you,

Jonathan Skalka
Commercial Escrow Officer

**David A. Lockshaw, Jr.**



**From:** TrackingUpdates@fedex.com <TrackingUpdates@fedex.com>
**Sent:** Friday, March 3, 2023 11:48 AM
**To:** Terri Y. Barnett <TBarnett@dickinson-wright.com>
**Subject:** EXTERNAL: FedEx Shipment 395266699146: Your package has been delivered

# Hi. Your package was delivered Fri, 03/03/2023 at 11:41am.

Delivered to 1909 E US-22, Morrow, OH 45152

**OBTAIN PROOF OF DELIVERY**

---

# Personal Message

PSShip eMail Notification

---

| | |
|---|---|
| **TRACKING NUMBER** | 395266699146 |
| **FROM** | Dickinson Wright PLLC |
| | 180 E. Broad Street |
| | Suite 3400 |
| | Columbus, OH, US, 43215 |
| **TO** | RES Farms, LLC |
| | Mr. Robert E. Stoll, II |
| | 1909 E US 22-3 |
| | Morrow, OH, US, 45152 |
| **REFERENCE** | 104629.00002.BridgesMD |
| **SHIPPER REFERENCE** | 104629.00002.BridgesMD |
| **SHIP DATE** | Thu 3/02/2023 07:13 PM |
| **DELIVERED TO** | Residence |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Columbus, OH, US, 43215 |
| **DESTINATION** | Morrow, OH, US, 45152 |
| **SPECIAL HANDLING** | Deliver Weekday |
| | Residential Delivery |
| | NSR |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |

2

**SERVICE TYPE**      FedEx Priority Overnight

# Get the FedEx®
# Mobile app

Create shipments, receive tracking
alerts, redirect packages to a FedEx
retail location for pickup, and more
from the palm of your hand
- **Download now**.

## This tracking update has been requested by:

| | |
|---|---|
| **Company name:** | Dickinson Wright PLLC |
| **Name:** | Michael D. Bridges |
| **Email:** | MBridges@dickinson-wright.com |

**FOLLOW FEDEX**

Please do not respond to this message. This email was sent from an unattended mailbox.
This report was generated at approximately 10:47 AM CST 03/03/2023.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the

selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2023 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

## David A. Lockshaw, Jr.

| | |
|---|---|
| **From:** | Michael D. Bridges |
| **Sent:** | Monday, March 27, 2023 1:56 PM |
| **To:** | bstoll1987@gmail.com |
| **Cc:** | Jan Adams; Kyle CORCORAN; Dominic SALINAS; David A. Lockshaw, Jr. |
| **Subject:** | RE: Clinton Solar - Closing Documents |
| **Attachments:** | Stoll.pdf |

Mr. Stoll,

Attached are the closing documents executed by our client for the March 31, 2023 closing.  We have had no response to prior email or correspondence.  As previously indicated, it is our client's expectation that the terms of the contract between you and our client will be honored.  If not we will be forced to pursue all available remedies.

Michael D. Bridges, Esq.

### Michael D. Bridges Member

180 E. Broad Street
Suite 3400
Columbus OH 43215

Phone 614-744-2577
Mobile 614-361-2509
Fax 844-670-6009
Email MBridges@dickinsonwright.com



DICKINSON WRIGHT pllc

ARIZONA  CALIFORNIA  FLORIDA  ILLINOIS  KENTUCKY  MICHIGAN  NEVADA
OHIO  TENNESSEE  TEXAS  WASHINGTON D.C.  TORONTO

---

**From:** Michael D. Bridges
**Sent:** Tuesday, March 14, 2023 2:13 PM
**To:** 'bstoll1987@gmail.com' <bstoll1987@gmail.com>
**Cc:** 'Jan Adams' <jan@coresolar.energy>; 'Kyle CORCORAN' <kyle.corcoran@totalenergies.com>; 'Dominic SALINAS' <dominic.salinas@totalenergies.com>; David A. Lockshaw, Jr. <DLockshaw@dickinson-wright.com>
**Subject:** RE: Clinton Solar - Closing Documents

Mr. Stoll,

Our records indicate that our Federal Express package with closing document has been delivered to the notice address provided in the Option and Purchase Agreement.  We attempted to contact at the email address you provided and attempted to call at the phone number provided.  As indicated in all of our correspondence, we want to facilitate a smooth closing consistent with the terms of your agreement with our client.  Please contact the undersigned promptly.

---

**From:** Michael D. Bridges
**Sent:** Monday, March 13, 2023 10:13 AM
**To:** 'bstoll1987@gmail.com' <bstoll1987@gmail.com>
**Cc:** 'Jan Adams' <jan@coresolar.energy>; Kyle CORCORAN <kyle.corcoran@totalenergies.com>; Dominic SALINAS

<dominic.salinas@totalenergies.com>; David A. Lockshaw, Jr. <DLockshaw@dickinson-wright.com>
**Subject:** Clinton Solar - Closing Documents

Mr. Stoll,

I want to follow-up on the correspondence previously submitted to you for the acquisition of the real property in Clinton County.  Please let me know if you have any questions on the closing documents.  We are looking forward to a smooth closing consistent with each parties' contractual requirements.


Michael Bridges, Esq.



20370106

### Real Property Conveyance Fee
### Statement of Value and Receipt

DTE 100
Rev. 5/20

**If exempt by Ohio Revised Code section 319.54(G)(3), use form DTE 100(EX).**
**TYPE OR PRINT ALL INFORMATION.**

| Type instrument | Tax list year | County number | Tax. dist. number | Date |
|---|---|---|---|---|
| | | | | |

Property located in _____ taxing district

Name on tax duplicate _____ Tax duplicate year _____

Acct. or permanent parcel no. _____ Map book _____ Page _____

Description                                Platted    Unplatted

Auditor's comments:   Split   New plat   New improvements   Partial value
                      C.A.U.V   Building removed   Other _____

**Grantee or Representative Must Complete All Questions In This Section. See instructions on reverse.**

1. Grantor's name  RES FARMS LLC                           Phone _____
2. Grantee's name  CLINTON SOLAR LLC                       Phone _____
   Grantee's address  4330 Gaines Ranch Loop, Suite 100, Austin, TX 78735
3. Address of property  SR 350
4. Tax billing address  4330 Gaines Ranch Loop, Suite 100, Austin, TX 78735
5. Are there buildings on the land?  ✓ Yes   No   If yes, check type:
   1, 2 or 3 family dwelling   Condominium   Apartment: No. of units _____
   Manufactured (mobile) home   Farm buildings  ✓ Other  Barn
   If land is vacant, what is intended use? _____
6. Conditions of sale (check all that apply)   Grantor is relative   Part interest transfer   Land contract
   Trade   Life estate   Leased fee   Leasehold   Mineral rights reserved   Gift
   Grantor is mortgagee   Other _____
7. a) New mortgage amount (if any) .................................................$ _____
   b) Balance assumed (if any) ......................................................$ _____
   c) Cash (if any) ........................................................................$    575,627.00
   d) Total consideration (add lines 7a, 7b and 7c) .......................$    575,627.00
   e) Portion, if any, of total consideration paid for items other than real property ........$ _____
   f) Consideration for real property on which fee is to be paid (7d minus 7e) ........$    575,627.00
   g) Name of mortgagee _____
   h) Type of mortgage    Conv.   F.H.A.   V.A.   Other _____
   i) If gift, in whole or part, estimated market value of real property ..........................$ _____
8. Has the grantor indicated that this property is entitled to receive the senior citizen, disabled person or surviving spouse homestead exemption for the preceding or current tax year?   Yes  ✓ No   If yes, complete form DTE 101.
9. Has the grantor indicated that this property qualified for current agricultural use valuation for the preceding or current tax year? ✓ Yes   No   If yes, complete form DTE 102.
10. Application for owner-occupancy (2.5% on qualified levies) reduction. **(Notice:** Failure to complete this application prohibits the owner from receiving this reduction until another proper and timely application is filed.) Will this property be grantee's principal residence by Jan. 1 of next year?   Yes  ✓ No If yes, is the property a multi-unit dwelling?   Yes  ✓ No

I declare under penalties of perjury that this statement has been examined by me and to the best of my knowledge and belief it is a true, correct and complete statement.

_____     _____
Signature of grantee or representative            Date

| | |
|---|---|
| Number | |
| No. of Parcels | |
| DTE Code No. | |
| Neigh. Code | |
| No. of Acres | |
| Land Value | |
| Bldg. Value | |
| Total Value | |
| DTE Use Only | |
| DTE Use Only | |
| DTE Use Only | |
| Consideration | |
| DTE Use Only Valid sale  1. Yes   2. No | |
| Receipt Number | |

### Receipt for Payment of Conveyance Fee

The conveyance fee required by Ohio Revised Code section (R.C.) 319.54(G)(3) and, if applicable, the fee required by R.C. 322, in the total amount of $ _____ has been paid by _____ and received by the _____ county auditor.

_____     _____
County auditor                                     Date

| Form **W-9**<br>(Rev. October 2018)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification**<br>▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | **Give Form to the<br>requester. Do not<br>send to the IRS.** |
|---|---|---|

**See Specific Instructions on page 3.** / **Print or type.**

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.
**CLINTON SOLAR LLC, a Delaware limited liability company**

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ ___

Note. Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

**6** City, state, and ZIP code

Requester's name and address (optional)

**7** List account number(s) here (optional)

**Part I  Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, *see How to get a TIN, later.*

**Note.** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

Social security number

**or**

Employer identification number

**Part II  Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**  Signature of U.S. person ▶ _____  Date ▶ _____

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9.*

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

● Form 1099-INT (interest earned or paid)

● Form 1099-DIV (dividends, including those from stocks or mutual funds)

● Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

● Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

● Form 1099-S (proceeds from real estate transactions)

● Form 1099-K (merchant card and third party network transactions)

● Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

● Form 1099-C (canceled debt)

● Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.*

**File 17000333420-06**

## Stewart Title Guaranty Company
## Combined Statement

3/1/2023 2:41 PM

Stewart Title Guaranty Company, Houston Energy
1360 Post Oak Blvd., 10th Floor, MC #10-1, Houston, TX 77056, (800) 729-1900
Escrow Officer: Jonathan Skalka

| | |
|---|---|
| **Seller(s)** | RES Farms LLC |
| **Buyer(s)** | Clinton Solar, LLC |
| **Lender(s)** | |
| **Property** | Property Address |
| | 0 SR 350 Martinsville, Ohio 45146 |
| | PIN |
| | 07003070200000 |

| Closing Date | 3/31/2023 | Disbursement Date | 3/31/2023 | Proration Date | 3/31/2023 |
|---|---|---|---|---|---|

| | Buyer | | | Seller | |
|---|---|---|---|---|---|
| **Debit** | **Credit** | | **Debit** | **Credit** |
| | | **Sales Price/Consideration** | | |
| $575,627.00 | | Contract sales price | | $575,627.00 |
| | | **Deposits** | | |
| | $10,000.00 | Option term payment (one time) 7/15/2020 | $10,000.00 | |
| | $1,549.77 | Option term payment (annual) 7/15/2020 | $1,549.77 | |
| | $1,549.77 | Option term payment (annual) 7/15/2021 | $1,549.77 | |
| | $1,549.77 | Option term payment (annual) 7/15/2022 | $1,549.77 | |
| | | **Prorations** | | |
| | $254.70 | 2022 County taxes $1,044.54 1/1/2023 to 3/31/2023 | $254.70 | |
| | | **Title Charges** | | |
| $2,000.00 | | Settlement or closing fee to Stewart Title Commercial Services - Houston Energy | | |
| $2,396.50 | | Owners Coverage $570,977.69 Owners Policy $2,382.75 to Stewart Title Guaranty Company | | |
| $599.13 | | ALTA 3.2-06 to Stewart Title Guaranty Company | | |
| $239.65 | | ALTA 8.2-06 to Stewart Title Guaranty Company | | |
| $150.00 | | ALTA 17-06 to Stewart Title Guaranty Company | | |
| $150.00 | | ALTA 25-06 to Stewart Title Guaranty Company | | |
| $500.00 | | ALTA 36.7-06 to Stewart Title Guaranty Company | | |
| $100.00 | | Commitment Fee to Stewart Title Guaranty Company | | |
| $1,298.25 | | Extended Coverage Surcharge to Stewart Title Guaranty Company | | |
| | | **Recording Fees/Transfer Charges** | | |
| $60.00 | | Recording and processing fees | | |
| | | County Deed Tax | $1,439.75 | |
| | | State Deed Tax | $575.70 | |
| **$583,120.53** | **$14,904.01** | **Subtotals** | **$16,919.46** | **$575,627.00** |
| | $568,216.52 | Balance due from Buyer | | |
| | | Balance due to Seller | $558,707.54 | |
| **$583,120.53** | **$583,120.53** | **Totals** | **$575,627.00** | **$575,627.00** |

File 17000333420-06

**Stewart Title Guaranty Company**
**Combined Statement**

3/1/2023 2:41 PM

Dated as of this _____ day of _____, _____

**Buyer(s):**

Clinton Solar, LLC
, a Delaware limited liability company

By: _____

Name: __Greg Nelson__

Title: __Chief Development Officer__

**Seller(s):**

RES Farms, LLC
an Ohio limited liability comapny

By:_____
Print Name: Robert E. Stoll, II
Its: Member

Stewart Title Guaranty Company
a Texas Corporation

By: _____
   Jonathan Skalka
   Commercial Services Specialist

_____
Date